Calvin **WILLIAMS**, Gilberto Gerena Valentin, Salvador Cartagena, Midge Brown, and Felix Berrios, on their own behalf and on behalf of all others similarly situated, Plaintiffs,

v.

Salvatore **SCLAFANI**, Herbert J. Feuer, Alice Sachs, Charles A. Avarello, Elrich A. Eastman, Elizabeth A. Cassidy, Matteo Lumina, Joseph J. Previte, Anthony Sadowski, and James Bass, Commissioners of the Board of Elections in the City of New York, as Members of, and constituting, the said Board of Elections, Defendants,

State of New York, Ramon S. Velez, Stephen Kaufman, and Hon. Mary Pinkett, Intervenor-Defendants.

No. 77 Civ. 4355.

United States District Court, S. D. New York.

Argued Oct. 12, 1977.

Decided Nov. 18, 1977.

896

Robert Schmukler, Brooklyn, N. Y., for plaintiffs; John C. Klotz, Michael R. Lanzarone, New York City, of counsel.

W. Bernard Richland, Corporation Counsel, New York City, for Board of Elections in the City of New York; Leonard Koerner, Patrick F. X. Mulhearn, New York City, of counsel.

H. Spencer Kupperman, Brooklyn, N. Y., for intervenor Hon. Mary Pinkett.

Stanley Schlein, New York City, for intervenor Stephen Kaufman.

Bleifer & Yalkut, P. C., New York City, for intervenor Ramon S. Velez; Paul E. Bleifer, Theodore E. Teah, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, New York City, for intervenor State of New York; George D. Zuckerman, New York City, of counsel.

Robert B. Fiske, Jr., U. S. Atty., New York City, for amicus curiae; Richard N. Papper, New York City, of counsel.

Before MULLIGAN, Circuit Judge, and GRIESA and WARD, District Judges.

ROBERT J. WARD, District Judge.

■ Plaintiffs Gilberto Gerena Valentin ("Valentin") and Felix Berrios ("Berrios")[1]

---

1. Plaintiff Valentin was the Democratic candidate for City Council from the 11th Councilmanic District in the Bronx and was elected in the November 8, 1977 general election. Calvin Williams and Salvador Cartagena, who were candidates in the Democratic primary race for City Council on September 8, 1977, were also plaintiffs until their claims were mooted by their respective defeats on September 8.

Midge Brown, a street registration voter whose signature on Williams' designating petition was validated by the City Board of Elections but invalidated by the New York courts, is also a

move before this three-judge court under § 5 of the Voting Rights Act, 42 U.S.C. § 1973c, for summary judgment against the defendant Commissioners of the Board of Elections in the City of New York, individually and collectively, ("City Board of Elections") in connection with a federal temporary restraining order of September 2, 1977 directing defendants to list Valentin as the Democratic nominee for the City Council from the 11th Councilmanic District in the South Bronx. In addition, plaintiffs move for leave to file a second amended complaint adding a cause of action under 42 U.S.C. § 1983 and another plaintiff. Jurisdiction over the Voting Rights Act and the Civil Rights Act claims is based on 28 U.S.C. § 1343. Intervenor-defendant Ramon S. Velez ("Velez") cross-moves for summary judgment and for an order vacating or modifying the order of September 2, 1977.[2] For the reasons hereinafter stated, the three-judge court denies plaintiffs' motion for summary judgment and grants Velez' cross-motion for summary judgment on the Voting Rights Act claim, grants plaintiffs' motion to file a second amended complaint, and denies as moot Velez' cross-motion to vacate or modify the temporary restraining order.[3]

## FACTUAL BACKGROUND

Intervenor-defendant Velez is the Democratic incumbent New York City Councilman representing the 11th Councilmanic District in the South Bronx. He and plaintiff Valentin sought the Democratic nomination for that position on the November 8, 1977 ballot in the primary election, which was held this year on September 8, 1977. As a prerequisite to placement on the primary ballot, a candidate must make a minimum showing of voter support. The showing required in this case was 1500 signatures on designating petitions. The period for collecting these signatures was June 7, 1977 to July 7, 1977.

Sometime prior to the signature-gathering period, plaintiff Valentin communicated with the City Board of Elections to inquire whether persons registering on the street pursuant to New York's recently enacted mail registration statute, New York Election Law § 153 (McKinney Supp.1976), could simultaneously sign his designating petitions.[4] It is undisputed that he was

---

plaintiff. However, it would appear that Williams' defeat would moot her interest.
   Berrios is a voter who signed Valentin's designating petition while registering by street registration, and had his signature validated by the City Board of Elections but invalidated by the New York courts. He claims to sue on behalf of all voters similarly situated. However, Berrios neglected to vote in the primary and did not move prior thereto for class certification pursuant to Rule 23(c), Fed.R.Civ.P. and S.D.N.Y. Civ.R. 11A(c) and (d). Intervenor-defendant Velez asserts that Berrios' interest is moot and that the class should not be certified. See White v. Mathews, 559 F.2d 852, 856–58 (2d Cir. 1977); Ringgold v. United States, 553 F.2d 309 (2d Cir. 1977) (per curiam); Boyd v. Justices, 546 F.2d 526, 527 n.2 (2d Cir. 1976). Inasmuch as Antonio Martinez, another street registrant who signed Valentin's petition, but who voted in the primary, is added as a plaintiff infra, it is unnecessary for this Court to determine whether, despite his not voting, Berrios still has sufficient interest in the outcome of this litigation that his claim is not moot.

2. On November 7, 1977, counsel for all parties appeared before the single district judge to whom this case is assigned. At that time coun-

sel for plaintiffs and counsel for Velez orally cross-moved for summary judgment on the Voting Rights Act claim.

3. Although plaintiffs did not formally move to add an additional plaintiff, when they moved to file a second amended complaint they submitted an affidavit of Antonio Martinez, stating: "I wish to join in the complaint of Mr. Felix Berrios." The Court deems this application to be a motion under Rules 15, 19 and 20, Fed.R.Civ.P.
   Martinez is obviously an appropriate plaintiff, see Note 1 supra, and inasmuch as his claim is identical to Berrios', defendants cannot be prejudiced by the addition or substitution of him as a plaintiff.
   Moreover, defendants had notice of Martinez' application but did not object thereto. Accordingly, leave is granted to add Martinez as a plaintiff, subject to defendants' confirming that Martinez actually signed Valentin's petition and voted on primary day.

4. It is conceded that pursuant to § 5 New York State officials duly submitted the mail registration statute to the United States Attorney General for pre-clearance and the latter interposed no objection.

informed by Ms. Betty Dolen, Executive Director of the City Board of Elections, that street registrants could validly sign a designating petition so long as the registration was stamped in at the City Board of Elections on or before receipt of the designating petition at the City Board. There is also no dispute that Ms. Dolen was convinced that she was giving the correct interpretation of what was permissible under the new mail registration statute and, accordingly, she consistently gave this advice to whoever inquired about petition-gathering.[5] This advice was also given to candidates, including Valentin, by Ms. Beatrice Berger, Chief Clerk of the Bronx Office of the City Board of Elections.[6]

Valentin followed the instructions of the City Board of Elections with respect to simultaneous signing of mail registrations and designating petitions, collected more than the required 1500 signatures, and submitted the designating petitions to the City Board. On August 1, 1977, the City Board by formal resolution validated Valentin's designating petitions over the objection of Velez that the 343 signatures of street registrants should be invalidated because they "signed before registration" ("SBR's").[7]

On or about August 1, 1977 a number of suits were filed in New York State Supreme Court by various candidates challenging *inter alia* the validity of SBR's. On or about August 5, 1977 the City Board of Elections changed its position on the validity of SBR's after being advised by the State Board of Elections that its earlier position was erroneous.[8] Thereafter, on August 22, 1977, the State Supreme Court invalidated the 343 SBR's on Valentin's designating petitions. *Velez v. Board of Elections and Valentin*, 397 N.Y.S.2d 907 (Sup. Ct., Bx.Co.). That brought Valentin below the 1500 required signatures; the State Court therefore directed that Valentin's name be removed from the primary ballot.[9]

5. *See* August 12, 1977 Testimony of Betty Dolen before Referees Paperno and Stackell in connection with *Salmon v. Board of Elections and Klotz*, Index No. 14421/77 (Sup.Ct., Bx. Co.); *e. g.*, Affidavit of Frank Baraff, dated October 7, 1977. Ms. Dolen's conviction was based on an "impression" formed on the basis of a telephone conversation she allegedly had a year earlier with someone from the State Board of Elections. She could not recall specifically with whom she had spoken other than that it would have been somebody who normally explained Board rulings and might have been "the Executive Director or the Deputy Executive Director, or counsel . . . ." *Id.* at 25. Stanley Zalen, Deputy Counsel for the New York State Board of Elections, in an affidavit dated September 17, 1977, states that "[t]he only instructions given by the New York State Board of Elections to be officially relied upon are issued in the form of written rules and regulations, written opinions, or written advisories. No official communications are ever given orally."

6. Report of Special Referee Lloyd I. Paperno, dated August 22, 1977, in connection with *Salmon v. Board of Elections, supra*, at 8–9; Affidavit of Valentin, dated September 11, 1977.

   As further proof that the City Board had a practice which induced reliance, and perhaps as proof that plaintiffs were justified in relying on the Board's advice, plaintiffs argue that the City Board of Elections approved written regulations authorizing a similar procedure in Com-

munity School Board elections held in 1975 and 1977. They argue that even though Education Law § 2590–c(6)(2) requires that nominating petitions be signed *inter alia* by 200 *registered* voters, and Education Law § 2590–a(8) defines registered voter as "an elector of the city of New York under the election law," the City Board of Elections in 1973 approved regulations permitting petitions to be signed by "200 eligible voters already registered or *who will have been registered*" by the filing date. The Court believes that the evidence submitted by the parties with respect to the Community School Board elections is not necessarily probative of the issues on which it is offered since the Board of Education is permitted to adopt procedures differing from those required under the Election Law. *See* Election Law § 467(1) (McKinney Supp.1976); Education Law § 2590–c(6)(1) (McKinney 1970). Curiously, however, in its Answer to the first amended complaint, the City Board of Elections did not deny the allegation that the same Election Law applies in School Board elections as in primary elections.

7. Although only Valentin is mentioned in the text, Williams and Cartagena followed the same advice and their SBR's were validated by the Board and invalidated by the State courts.

8. Testimony of Betty Dolen, *supra*, at 28, 31.

9. Velez argues that even if this Court concludes that the SBR's could not be invalidated, Valen-

The Court's decision regarding the SBR's was based on its adoption of the report of Special Referee Lloyd I. Paperno. That report had concluded that the interpretation of the mail registration statute which Dolen and Berger had been publicly disseminating "would not be binding upon the court in any event inasmuch as they pertain to the interpretation of the statute."[10] Similarly, in the related case of *Cartagena v. Board of Elections,* Index No. 14489/77 (Sup.Ct., Bx.Co.), Justice William P. McCooe concluded, in a decision dated August 22, 1977, that the oral opinion of the Executive Director of the City Board of Elections was of no force and effect for two reasons. First, he concluded that the oral advice was inconsistent with Sections 153(7)[11] and 135[12] of the New York Election Law which he construed to require that the signatory actually be enrolled as a voter at the time of signing the designating petition. Second, he concluded that the oral advice, in addition to being wrong, was unauthorized because only the *State* Board of Elections is authorized to make regulations[13] and such regulations have force and effect only when written and filed with the Secretary of State.[14]

On August 25, 1977, the Appellate Division, First Department, unanimously affirmed without opinion the Supreme Court determination. The New York Court of Appeals denied leave to appeal on August 30, 1977. Valentin has appealed to the United States Supreme Court.

## THE FEDERAL LITIGATION

■ Plaintiffs commenced this suit by bringing on an order to show cause before Judge Ward, to whom the case was assigned, on Friday, September 2, 1977, to restrain the City Board of Elections from removing the names of Valentin, Calvin Williams, and Salvador Cartagena from the ballot. The entire afternoon was devoted to argument on that application, which was on notice to the members of the City Board of Elections, the only defendants at that point.[15] At the argument, the City Board was represented by counsel to the Board of Elections and an Assistant Corporation Counsel. Ms. Dolen, and her assistant, Mr. Danny DiFrancisco, were also present.

The theory advanced by plaintiffs at that time was that the New York courts' invalidation of the SBR's of Valentin, Williams and Cartagena resulted in non-compliance

tin should be denied relief because some of those signatures were allegedly tainted by fraud. This is clearly an issue for the State courts. The State courts declined to reach this additional ground for invalidation.

**10.** The Paperno Report was also adopted by Justice McCooe in the related case of *Salmon v. Board of Elections and Klotz, supra.*

**11.** Section 153(7)(a) of the Election Law (McKinney Supp.1976) provides: "The voter registration, enrollment and transfer of registration, shall be complete upon receipt of the application by the appropriate county board of elections . . . ."

**12.** Section 135(2) of the Election Law (McKinney Supp.1976) requires a signatory of a designating petition to swear that he is a "duly enrolled voter."

**13.** *See* Election Law §§ 469 and 470 (McKinney Supp.1976).

**14.** *See* Executive Law § 102 (McKinney 1972 and 1976 Supp.).

**15.** Velez complains that he did not have notice of the application for the temporary restraining order. It might have been preferable for Velez to have been given notice, but it is clear that notice was not required since Velez was not yet a party, and was not required to be named as a party. He might have been a proper party for joinder, and it might have been preferable to have named him as one, but certainly he was not an indispensable party within Rule 19. *Griffin v. Burns,* 431 F.Supp. 1361 (D.R.I.1977).

Velez also complains that Blanca Velez, a third candidate in the Democratic primary for the Councilmanic seat from the 11th District and who also was removed from the ballot in the State Supreme Court, should have been made a party plaintiff. At the same time he reserves the right to object to adding Blanca Velez. The Court regards this as a spurious issue. Blanca Velez had notice of this suit and has had ample opportunity to intervene, but has not done so. Furthermore, counsel for Ramon Velez concedes "the failure of BLANCA VELEZ to qualify [for the primary ballot] even adding the count of her S.B.R. [signed before registration] signatures." Affidavit of Paul E. Bleifer, dated October 7, 1977, at 3.

with § 5 of the Voting Rights Act and, therefore, the invalidation must be enjoined. Section 5 of the Voting Rights Act, which concededly applies to Bronx County, renders unenforceable "any voting qualification . . . or standard, practice or procedure with respect to voting" different from that in force and effect in Bronx County on November 1, 1968, unless it has previously been approved by the United States Attorney General or the Attorney General has failed to act within 60 days after submission to him, or unless in a suit brought by the State or subdivision a United States District Judge for the District of Columbia has issued a declaratory judgment that such change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." [16] Plaintiffs argued primarily on the basis of *Perkins v. Matthews,* 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971) and *Allen v. State Board of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), that the advice given by the City Board of Elections constituted a qualification, standard, practice or procedure and that the New York courts' interpretation of the Election Law changed the qualification, standard, practice or procedure previously adopted by the City Board of Elections. It followed, they argued, that the decision of the New York courts constituted a new qualification, standard, practice or procedure requiring pre-clearance by the Attorney General or by a declaratory

16. Section 5 provides:

§ *1973c. Alteration of voting qualifications and procedures; action by state or political subdivision for declaratory judgment of no denial or abridgement of voting rights; three-judge district court, appeal to Supreme Court*

Whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title ·based upon determinations made under the first sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force and effect on November 1, 1964, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the second sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the third sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1972, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided,* That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made. Neither an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object, nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. In the event the Attorney General affirmatively indicates that no objection will be made within the sixty-day period following receipt of a submission, the Attorney General may reserve the right to reexamine the submission if additional information comes to his attention during the remainder of the sixty-day period which would otherwise require objection in accordance with this section. Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court.

judgment from a federal district judge in the District of Columbia. Until such pre-clearance was obtained, they argued, the change was unenforceable.

The § 5 argument raised by plaintiffs was not free from doubt, but appeared to Judge Ward to raise serious questions going to the merits in the light of the broad pronouncements of *Allen* and *Perkins, supra.* Further, Judge Ward believed that plaintiffs demonstrated a clear showing of irreparable harm and a balance of hardships tipping decidedly in their favor, *cf., Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 250 (2d Cir. 1973), insofar as the cost of reinstating Valentin, Williams and Cartagena on the ballot at that point was *de minimus* when compared with the injury the City, Valentin, Williams, Cartagena, and the voters would suffer if this Court were to determine sometime later that the candidates should not have been removed from the ballot. The remedy in the latter case would in all likelihood have been a new primary, *see* Starr, Federal Judicial Invalidation as a Remedy for Irregularities in State Elections, 49 *N.Y. U.L.Rev.* 1092 (1974), which would have involved added costs and inconvenience to the City and candidates, and which would have been inadequate in that it could not have duplicated the circumstances which existed on the original primary date. Furthermore, Judge Ward believed that granting the restraining order would not prejudice the opposing candidates because if Williams, Cartagena and Valentin were defeated this action would be moot; if any of them won there would be ample opportunity for this Court to examine the merits further, if necessary, and to order appropriate remedial measures. Accordingly, at 5:40 P.M., Judge Ward signed the temporary restraining order.

On September 6, 1977, attorneys for the opposing candidates moved before Judge Vincent L. Broderick, in Part I, to intervene in this suit and to vacate the temporary

restraining order.[17] Judge Broderick granted the motions for intervention and denied the motion to vacate the restraining order. On September 8, Valentin defeated Velez by a margin of less than 2%.

Four days later, on September 12, Velez filed a cross-motion to vacate or modify the temporary restraining order and the Court heard counsel for plaintiffs, the City Board of Elections, and the intervenor candidates argue the question of whether a three-judge court must be convened pursuant to 42 U.S.C. § 1973c to decide if the alleged change in qualification, standard, practice or procedure was covered by § 5 of the Voting Rights Act. *See United States v. Board of Supervisors*, 429 U.S. 642, 97 S.Ct. 833, 50 L.Ed.2d 106 (1977) (per curiam); *Perkins v. Matthews*, 400 U.S. at 383–87, 91 S.Ct. 431; *Allen v. State Board of Elections*, 393 U.S. at 559, 89 S.Ct. 817. At that time the Court suggested that the State of New York, which under 28 U.S.C. § 2284 was required to be notified of this suit, might want to intervene as a defendant. It has done so.

On September 16, the United States of America submitted an *amicus curiae* brief taking the position that the decision of the New York courts was subject to the § 5 requirement of federal pre-clearance. At that time Judge Ward also heard further argument from all parties on the question of whether to convene a three-judge court. Following the argument, Judge Ward announced that he would formally request that a three-judge court be convened and, on October 3, 1977, the Chief Judge of the Court of Appeals signed an order convening a three-judge court. The panel heard argument on the applicability of § 5 on October 12, 1977.

## DECISION OF THREE–JUDGE COURT

### *Voting Rights Act Claim*

■ Assuming that the conduct of the City Board of Elections here amounted to a

---

**17.** The opponents of Williams and Cartagena no longer have a direct interest in this action inasmuch as their stake in the outcome was mooted when they defeated Williams and Cartagena in the primary.

qualification, standard, practice or procedure with respect to voting,[18] this three-judge court is of the view that § 5 was not intended to cover a change in such a qualification, standard, practice or procedure brought about by a state court decision construing or interpreting an already pre-cleared state voting statute. This holding is based on judicial precedent, the text of the statute and its legislative history and strong policy considerations.

Plaintiffs and the Government *amicus* rely on *City of Richmond v. United States,* 422 U.S. 359, 358, 95 S.Ct. 2296, 45 L.Ed.2d 245 (1975); *Perkins v. Matthews, supra*; and *Citizens Committee to Oppose Annexation v. City of Lynchburg,* 400 F.Supp. 68 (W.D.Va.), *aff'd in part and vacated in part,* 528 F.2d 816 (4th Cir. 1975), *injunction denied,* 423 U.S. 1043, 96 S.Ct. 766, 46 L.Ed.2d 632 (1976), for the proposition that court decrees are subject to review under § 5.

The Court believes that the cases cited do not warrant the broad reading plaintiffs give them. With respect to *City of Richmond, Perkins* and *City of Lynchburg,* plaintiffs fail to recognize that the real concern was with *what* change had been effected, i. e., enlargement of municipalities by annexation. Thus, *Perkins* held, and *City of Richmond* and *City of Lynchburg* followed the holding, that annexations constitute a standard, practice or procedure with respect to voting. However, those cases were not directly concerned with, and consequently did not specifically speak to, *how* the change—the annexation—was brought about. Thus, the courts did not hold that court decrees *per se* are, or are not, subject to § 5.

Moreover, that there was court involvement in those cases is of no precedential value here inasmuch as the court involvement in those cases is readily distinguishable from the involvement of the New York courts in this case. For example, in *Perkins* there was a Mississippi statute which provided that before a municipality could expand or contract its corporate limits it must petition the Chancery Court where any party in interest may object and litigate his objections. D.C., 301 F.Supp. 565 at 567 n.3. Since an annexation took place in *Perkins,* presumably it was pursuant to court order. Thus, the court could be considered to have participated in the annexation. *Cf., Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). Similarly, in *City of Richmond* and *City of Lynchburg* there was a Virginia statute permitting municipal annexations only upon obtaining a favorable judgment from a specially constituted three-judge annexation court determining that specified statutory standards had been satisfied. 422 U.S. at 362, 95 S.Ct. 2296; 400 F.Supp. at 71 n.2, 75.

Clearly these "annexation courts" were not acting in a strict judicial capacity, e. g., construing statutes, but were acting in a quasi-legislative or quasi-executive capacity, advising on, approving, implementing or vetoing legislation. *See generally Comment,* The State Advisory Opinion in Perspective, 44 *Fordham L.Rev.* 81 (1975). Inasmuch as the state courts in the instant case acted in a strict judicial capacity in simply construing a pre-cleared state statute—and were not even enforcing an unsubmitted statute—it is apparent that the annexation cases relied upon by plaintiffs and the Government *amicus* are readily distinguishable, if not *sui generis.*

Plaintiffs, in addition, rely on *Allen v. State Board of Elections, supra,* for the broad proposition that every change in practice is covered by § 5 irrespective of how that change was brought about. They cite the change that occurred in *Allen* as an

---

**18.** The United States of America filed a second *amicus* brief on October 13, 1977, taking the position that the City Board of Elections' conduct did amount to a qualification, standard, practice, or procedure. If the Government is correct, then it would seem, as the Government contends, that the City Board's "practice" should have been pre-cleared. However, it is conceded that no pre-clearance was obtained. In view of the Court's disposition of the Voting Rights claim, *infra,* it is unnecessary to reach the question of whether it was necessary to obtain pre-clearance of the City Board's "qualification, standard, practice, or procedure," and if so, what effect the failure to do so would have on this action.

example of the breadth of § 5's application. That change was brought about by a bulletin issued by the Virginia Board of Elections to all election judges in an attempt to modify the statutory practice. Since the change was caused by administrative rather than judicial action, that illustration lends no support to plaintiffs' position. Furthermore, the broad language plaintiffs quote from *Allen* evidences a concern with administrative and legislative action, not court decrees.[19] This is understandable in view of the fact that the Court was faced only with legislative enactments and administrative regulations. As a result, *Allen* does not necessarily foreclose application of § 5 to state court decrees; but, on the other hand, it certainly cannot be read to support plaintiffs' contention—a proposition which was not before it and which involves distinct policy and constitutional considerations.

Thus, plaintiffs have failed to cite any controlling or persuasive precedent for their position. Furthermore, there is authority to the contrary. *Gangemi v. Sclafani,* 506 F.2d 570 (2d Cir. 1974); *Webber v. White,* 422 F.Supp. 416 (N.D.Tex.1976).

More importantly, the text of § 5 and what little legislative history there is seems to indicate that the statute was directed against the legislative and executive branches of state governments, and certainly does not indicate that it was intended to cover state court decrees. The statute by its terms applies "[w]henever a State or political subdivision . . . shall *enact or seek to administer*" a covered qualification, standard, practice or procedure that has not been pre-cleared. Since courts do not "enact or seek to administer," on its face § 5 appears inapplicable to court decrees. Moreover, the legislative history in

so many words indicates that this was the intent of the draftsmen: "This section deals with attempts by a State or political subdivision with respect to which the prohibitions of section 4 are in effect to *alter by statute or administrative acts* voting qualifications and procedures in effect on November 1, 1964." H.Rep. No. 439, 89th Cong., 1st Sess. (1965), reprinted in 1965 United States Cong.Code and Admin.News pp. 2437, 2457–58 (emphasis added). Thus, the text and legislative history of § 5 do not support plaintiffs' contention that § 5 applies to state court decrees.[20]

Most importantly, there are strong policy reasons why state court decrees, as discussed in *Webber v. White, supra,* should not be covered by § 5. The most important of these considerations is that to hold state court decrees *per se* subject to § 5 would mean that the State executive could be required to collaterally support, in a federal district court in a foreign forum, innumerable state court rulings, with which the executive might not even agree and which resulted from purely private suits. The Court believes that such a requirement would pose at the very least serious problems of comity, if not constitutionality. *See Webber v. White, supra.*

■ For all the foregoing reasons, this Court holds that § 5 was not intended to apply to state court decrees which simply construe an already pre-cleared statute.

■ Perhaps in anticipation of this ruling plaintiffs filed a first amended complaint in which they alleged that it was the City Board of Elections' August 5, 1977 change in position *as well as* the court decrees which constituted the change that brought about the new qualification, standard, prac-

---

**19.** *E. g.,* "The Voting Rights Act was aimed at the subtle, as well as the obvious, state *regulations* . . . ." 393 U.S. at 565, 89 S.Ct. at 831 (emphasis added); "Congress intended that state *enactments* such as those involved in the instant cases be subject to the § 5 approval requirements." *Id.* at 566, 89 S.Ct. at 832 (emphasis added); "Congress intended to reach any state *enactment* which altered the election law of a covered State in even a minor way." *Id.* (emphasis added).

**20.** The regulations promulgated under § 5 by the Department of Justice likewise lend no direct support to plaintiffs' position. *See* 28 C.F.R. pt. 51 (1976). In fact, § 51.4(c) enumerates examples of the "*[l]egislation* and *administrative actions* constituting changes affecting voting covered by section 5 . . . ." (emphasis added). Judicial decrees are not mentioned.

tice or procedure. They alleged that the City Board's change of position, which occurred after the City Board had validated Valentin's petitions and while the matter was pending in State Supreme Court, was communicated to various judicial officers involved in the invalidation proceedings and influenced the outcome of the State proceedings. These allegations are repeated in the proposed second amended complaint. Assuming the truth of these allegations, the Court holds that they are legally insufficient to state a claim under § 5 of the Voting Rights Act. Plaintiffs clearly do not allege that the courts' construction of the Election Law was arrived at in bad faith, or that the judicial officers conspired, for example, with the City or State Boards of Election, to racially discriminate against plaintiffs. Thus, even assuming the State courts' awareness of the City Board's conferring with the State Board and then changing its position, and assuming that this influenced the judicial officers interpreting the law, it still remains that the practical effect of accepting plaintiffs' position would be to require pre-clearance of a state court decision involving no more than a good faith statutory construction. Since this Court has already held that such a procedure was not contemplated by Congress, it will not compel this result under the guise of plaintiffs' "new theory."

There being no genuine issues of material fact, *see* Rule 56, Fed.R.Civ.P.; *Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975), summary judgment on the Voting Rights Act claim is granted in defendants' favor.

### Motion to Amend

Plaintiffs, following a suggestion made by the panel at oral argument, seek leave under Rule 15(a), Fed.R.Civ.P., to serve and file a second amended complaint to add a

claim under 42 U.S.C. § 1983 for deprivation without due process of their respective rights to vote and to appear on the ballot.[21] It is well settled that "leave [of court] shall be freely given when justice so requires." Rule 15(a). The rights which plaintiffs claim were infringed are so fundamental that it is clearly in the interests of justice to permit these claims to be adjudicated in this suit. Therefore, absent prejudice to defendants, the Court would be inclined to grant the motion to amend.

No objections to this amendment have been interposed by the defendant City Board of Elections or by the intervenor-defendant State of New York. However, intervenor-defendant Velez objects on the grounds that the amendment is futile and will cause delay, to his prejudice, and raises various defenses going to the merits.

█ The Court believes that it is premature to address the merits or Velez' defenses. At this point, however, it is prepared to rule that plaintiffs' § 1983 claim is not so insubstantial that the Court can conclude that the amendment would be futile. As to delay, it is true that the amendment will delay the disposition of this case. However, when due process allegations are made, seriously challenging the invalidation of a candidate's nominating petitions and raising doubts, if not suspicions, as to the integrity of an election, it is this Court's duty to act, even if some delay attends. This is particularly true when the prejudice, if any, to Velez still can be remedied by a court order setting aside the election and ordering a new election between Velez and the other party candidates, should Velez ultimately prevail on the merits. *See* Starr, Federal Judicial Invalidation as a Remedy for Irregularities in State Elections, 49 *N.Y. U.L.Rev.* 1092 (1974). *See also* Develop-

---

**21.** *See* ¶¶ 44 *et seq.* of the proposed Second Amended Complaint. In addition, on November 7, 1977 plaintiffs moved orally before Judge Ward to add a fourth cause of action under the fourteenth amendment and 28 U.S.C. § 1331, *see Gentile v. Wallen,* Dkt. No. 7093 (2d Cir., Sept. 15, 1977). This would be based on the same facts and theory as the third cause of

action, except that it would obviate the question, if any, of who is a suable party under § 1983; accordingly, it might be akin to a motion under Rule 15(b), Fed.R.Civ.P., to conform the pleadings to the proof. However, this motion was never formally addressed to the three-judge court and therefore it will not be considered.

ments in the Law—Elections, 88 *Harv.L. Rev.* 1111, 1298–1339 (1975). Accordingly, the motion to amend is granted. Plaintiffs are granted leave to serve and file the second amended complaint within ten days of the date of this decision.

The three-judge court having been convened pursuant to 42 U.S.C. § 1973c and 28 U.S.C. § 2284 to hear the Voting Rights Act claim, and that claim having been disposed of by summary judgment in defendants' favor, the statutory three-judge court is hereby dissolved and the § 1983 claim alleged in the second amended complaint is remanded to the single district court judge to whom this case is assigned.

It is so ordered.