Emma GRESHAM, Turetha Neely, Clayton Neely, Jr., Sharon Anfield, Donald Wright, Melvin Streetman, Earl M. Neely, Mary L. Holland, Alvin Lewis, Sr., Nollie Mae Morris, Quinton Gresham, Plaintiffs,

v.

Joe Frank HARRIS, Governor of Georgia, Michael J. Bowers, Attorney General of Georgia, Russell N. Sewell, Jr., Executive Counsel to the Governor of Georgia, State Election Board of Georgia, Max Cleland, Secretary of State of Georgia and Chairman of the State Election Board, Burke County Board of Registrars, Weston Fortson, W.E. Bessent, John M. Moseley, Chief Registrar and Members Respectively of the Board of Registrars, Burke County Board of Elections, Ralph B. Willis, Michael N. Searles, and Morris Green, Chairman and Members Respectively of the Board of Elections, Defendants.

Civ. A. No. 1:87–CV–867–JOF.

United States District Court, N.D. Georgia, Atlanta Division.

June 30, 1988.

Judgment Vacated Dec. 5, 1988. See 109 S.Ct. 523.

Lewis Pitts, Gayle Korotkin, Chapel Hill, N.C., Neil T. Bradley, Moffatt Laughlin McDonald, American Civil Liberties Union, Atlanta, Ga., for plaintiffs.

Hugh Jeffery Lanier, Office of State Atty. Gen., Atlanta, Ga., Preston B. Lewis, Jr., Lewis & Lewis, Waynesboro, Ga., for defendants.

Before EDMONDSON, Circuit Judge, and ROBERT H. HALL and FORRESTER, District Judges.

## ORDER

FORRESTER, District Judge.

This action under the Voting Rights Act is before the three-judge court on the plaintiffs' motion for a permanent injunction. The plaintiffs seek to extend this court's preliminary injunction, which enjoined the defendants from implementing any voting changes directed by the Burke County Superior Court in its December 30, 1987 order absent pre-clearance under section 5 of the Voting Rights Act. For the reasons discussed below, the plaintiffs' motion for a permanent injunction will be granted.

I. FACTS AND PROCEDURAL HISTORY.

The following facts were stipulated by the parties at the January 14, 1988 hearing before the three-judge court.

1. The plaintiffs are black registered voters and residents of Burke County, Georgia.

2. The town of Keysville was incorporated in 1890 pursuant to Georgia Law 1890–91, Volume II, p. 657.

3. The boundaries of Keysville were fixed by the Legislature and extend "one-half mile in every direction from the schoolhouse which is now located in said town of Keysville." *Id.* The boundaries of the town have never been changed subsequent to their designation in the original act of

incorporation by legislative act or municipal annexation.

4. The schoolhouse referred to in the 1890 Georgia law was destroyed and its exact location is in dispute.

5. There are approximately 165 registered voters in the town of Keysville (as defined by the boundaries used by Burke County officials for the January 4, 1988 elections), of whom the majority are black.

6. Pursuant to its act of incorporation the municipal government of Keysville consists of a mayor and five council members elected on the first Monday in January 1891 and on the same day annually thereafter for one-year terms of office.

7. Keysville is a current municipality of the State of Georgia. However, until January 4, 1988 there had been no elections for the mayor and council and no municipal office holders since approximately 1933.

8. For several years the plaintiffs and other black residents of Keysville tried to reactivate the municipal government of Keysville and elect a mayor and council.

9. In 1985, the Burke County attorney, on behalf of Keysville residents, requested the State Attorney General to advise him how to reactivate the municipal government. The Attorney General responded by letter dated August 2, 1985.

10. The Georgia Municipal Election Code, O.C.G.A. Section 21–3–408(b), provides that in the event of a vacancy in any municipal office, and if, as in Keysville, the municipal charter fails to provide a method for the filling of such vacancy, "the governing authority shall thereupon call a special election to fill such vacancy."

11. All municipal elections are conducted by "the superintendent, registrars, deputy registrars, poll officials and other employees" selected by the governing authority. O.C.G.A. Section 21–3–8(3).

12. Since the offices of the governing authority for Keysville were vacant, and pursuant to the advice of the Attorney General, the plaintiffs and other residents of Keysville conducted a town meeting on September 5, 1985, after which plaintiff Turetha Neely and Upton Cochran were given an oath of office as putative co-superintendents of election by the probate judge of Burke County, and called a special election for the mayor and council for January 6, 1986.

13. Plaintiff Emma Gresham qualified for mayor and plaintiffs Clayton Neely, Jr., Anfield, Wright, Streetman, and Earl M. Neely qualified for the council. None of these candidates had any opposition and, after the closing of the qualifying time but before the scheduled election, all were declared elected and were administered the oath of office by the probate judge on December 30, 1985.

14. On the same day, five white citizens of Keysville, who are the intervenors in this case, sought and were granted a temporary restraining order by the Superior Court of Burke County enjoining plaintiff Turetha Neely, the Board of Registrars of Burke County, and others from holding the elections on January 6, 1986 on the grounds that the elections were not being held in conformity with state law.

15. On January 17, 1986, the superior court issued a preliminary injunction enjoining the scheduling or conducting of any municipal election for Keysville until all the requirements of state law were met.

16. It was not possible for elections for the mayor and council to be conducted in literal conformity with the Georgia Municipal Election Code since the offices of the governing authority, which has the duty of calling elections and selecting election officials, were vacant.

17. The plaintiffs requested the members of the Georgia General Assembly who represent Burke County to introduce and enact legislation reactivating the government of Keysville, but the legislators refused.

18. Pursuant to Article V, Section II, para. VII of the Constitution of Georgia, "[w]hen any public office shall become vacant by death, resignation, or otherwise, the Governor shall promptly fill such vacancy unless otherwise provided by this Constitution or by law."

19. The plaintiffs and other residents of Keysville requested the Governor to exercise his constitutional authority and appoint persons to the mayor and council of Keysville, but the Governor upon the advice of his Executive Council and the Attorney General refused to do so.

20. The Georgia General Assembly enacted Georgia Laws 1987, p. 178, which was precleared by the Attorney General of the United States and became effective on July 1, 1987, providing that:

> in the event that all seats on the governing authority of a municipality are vacant, the elections superintendent of the county in which the municipality is located shall have the authority to call for a special election to fill the vacant offices and to conduct, or to appoint a superintendent of elections for the municipality for the purpose of conducting, the special election. The Board of Registrars for the county shall prepare the electors list for the special election.

O.C.G.A. Section 36–30–13.

21. The office of the Attorney General of Georgia wrote to the Secretary of State concerning O.C.G.A. Section 36–30–13 dated August 7, 1987.

22. The Burke County election board, pursuant to Section 36–30–13, called an election for January 4, 1988 to fill the vacancies in the municipal government of Keysville. The call for the election, together with a map designating the boundaries of the town and showing the area from which persons would be allowed to vote, were prepared by Burke County officials and submitted to the Attorney General of the United States pursuant to section 5. The submission was precleared on December 9, 1987.

23. On December 3, 1987, the plaintiffs in *Poole v. Lodge*, Civil Action No. 85–V–414, a group of white residents of Burke County, filed a motion to enjoin the county election board and board of registrars from conducting the January 4, 1988 elections on the ground that the boundaries of Keysville had not been determined.

24. The superior court held a hearing on the motion on December 30, 1987 and, in an order entered December 31, 1987, enjoined the January 4, 1988 elections. The court also enjoined the defendants "from taking any actions with regard to the scheduling or conducting of municipal elections until such time as the municipal boundaries for the town of Keysville have been properly determined in accordance with the requirements of law."

25. On December 30, 1987 the plaintiffs filed a motion for a temporary restraining order and preliminary injunction in this case to enjoin the defendants from implementing the voting changes contained in the state court order absent preclearance under section 5. Judge Forrester, sitting as a single judge court, held a hearing on the motion on December 31, 1987, at which counsel for the county and state defendants indicated that the voting changes contained in the state court order were required to be precleared under the Voting Rights Act prior to being implemented.

26. Following the hearing, Judge Forrester granted the plaintiffs' motion to join the Burke County Board of Elections and the Board of Registrars as additional party defendants, ruled that the voting changes contained in the state court order were subject to section 5, granted the motion for a temporary restraining order, and enjoined the defendants from failing to conduct the precleared January election.

27. The election was held as scheduled on January 4, 1988. Four blacks and one white were elected to the city council and a black was elected mayor.

On January 13, 1988, Judge Roney, Chief Judge of the Eleventh Circuit, designated Circuit Judge J.L. Edmondson and District Judge Robert H. Hall to serve with Judge Forrester as members of a three-judge court to hear and determine the action pursuant to 28 U.S.C.A. Section 2284(b)(1). The motion by James E. Poole, Jr., William C. Harmon, J.W. Marshall, Fred Muns, Louie B. Way, and Julian H. Kight to intervene was granted.

The three-judge court held a hearing on January 14, 1988 on the plaintiffs' motion for a preliminary injunction. Based upon

the foregoing evidence and after hearing oral argument, the court granted the preliminary injunction, reasoning that a state court may change a precleared election date or halt a precleared election only if the court first obtains preclearance of its order. The parties consented to the use of the record developed at the hearing as the basis for the court's ruling on the plaintiffs' motion for a permanent injunction. The court directed the parties to submit post-hearing briefs and took the plaintiffs' motion for a permanent injunction under advisement.

## II. DISCUSSION.[1]

Section 5 of the Voting Rights Act, found at 42 U.S.C. § 1973c, requires that any state or political subdivision covered by the Act submit to federal scrutiny "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964." The requisite "preclearance" may be obtained in one of two ways:

> First, the State or political subdivision may institute an action in the District Court for the District of Columbia for a declaratory judgment that the proposed change does not have the purpose or effect of abridging the right to vote on account of race; second, it may submit the proposed change to the Attorney General. No new voting practice or procedure may be enforced unless the State or political subdivision has succeeded in its declaratory judgment action or the Attorney General has declined to object to a proposal submitted to him. Attempts to enforce changes that have not been subjected to section 5 scrutiny may be enjoined by any three-judge district

court in a suit brought by a voter or by the Attorney General on behalf of the United States.

*United States v. Board of Supervisors of Warren County, Mississippi,* 429 U.S. 642, 645, 97 S.Ct. 833, 834, 51 L.Ed.2d 106 (1977) (citations omitted).

It is undisputed in this case that the superior court order at issue applies to a political subdivision covered by the Voting Rights Act and that the order has not been precleared. The parties agree that the superior court order, if it enacts a change in voting procedure within the terms of section 5, must be precleared. *See Hathorn v. Lovorn,* 457 U.S. 255, 102 S.Ct. 2421, 72 L.Ed.2d 824 (1982). In deciding this section 5 action, this court does not sit to determine whether the superior court order does or does not have the purpose or effect "of denying or abridging the right to vote on account of race or color" or to determine the validity of the superior court's interpretation of Georgia law. The only question before this court is whether the superior court order effects a change in voting requirements that must be precleared under section 5 before being enforced.

The intervenors, the only parties opposing preclearance of the superior court order, advance several arguments against extending the preliminary injunction into a permanent injunction. None of the intervenors' arguments are persuasive. First, the intervenors argue that the superior court order did not effect a change in voting requirements under section 5 because the order changed neither the boundaries of Keysville nor the manner of holding elections there, because it did not institute a practice different from that in effect on November 1, 1964, because the January 4, 1988 election had not yet occurred and was

---

**1.** Though the intervenors objected at the January 14 hearing that venue in the Northern District is improper under 28 U.S.C. 1391—because arguably the claim arose in the Southern District and the Burke County defendants reside there—it is not necessary for the court to decide which district is the proper venue for this case. First, venue is a personal privilege that cannot be raised by one party on behalf of another, *Camp v. Gress,* 250 U.S. 308, 316, 39 S.Ct. 478, 481, 63 L.Ed. 997 (1919), and that is waived if it

is not raised. *See, e.g., Leroy v. Great Western United Corporation,* 443 U.S. 173, 180, 99 S.Ct. 2710, 2715, 61 L.Ed.2d 464 (1979). The Burke County defendants stipulated at the hearing that they do not object to this venue. Second, an intervenor cannot object to venue. *See, e.g.,* 3B *Moore's Federal Practice* para. 24.19 at 24–901. Finally, the intervenors here appear to have dropped the objection, since they do not raise it in their post-hearing brief.

therefore not yet a practice, and because the Attorney General had no previous practice with which to compare the superior court order.

Whether or not the superior court order changed the boundaries of Keysville, it is clear that the order did, at the least, change the date of the election, if not halt it altogether. A change in the date of an election, even if effected merely to comply with a statute that had already received clearance, requires approval by the Attorney General under section 5. *NAACP v. Hampton County Election Commission,* 470 U.S. 166, 178, 105 S.Ct. 1128, 1135, 84 L.Ed.2d 124 (1985). The fact that the superior court order did not purport to change the boundaries of Keysville is irrelevant since the date change alone was sufficient to require preclearance.[2]

Contrary to the intervenors' textual argument, i.e., that the superior court order effected no voting change since the practice in Keysville on November 1, 1964 was the same as that resulting from the superior court order, the benchmark for determining whether voting practices have changed is the most recent precleared practice if that practice post-dates November 1, 1964. *See NAACP, DeKalb County Chapter v. State of Georgia,* 494 F.Supp. 668, 677 (N.D.Ga.1980) (three-judge court); 28 CFR section 51.54(b) ("the comparison shall be with the last legally enforceable practice or procedure used by the jurisdiction"). As the court noted in *NAACP,* "the exact language of the statute would support" the intervenors' reading of section 5, but that reading "would lead to a result tantamount to repeal of the Act." 494 F.Supp. at 677.

Second, the intervenors argue that the superior court order is merely a judicial decision enforcing previously precleared election law, specifically Georgia's residency requirement. Since the court determined that the town's boundaries were indeterminate, the argument goes, it could not be said that the electors identified by the county officials were residents of Keys-

ville. In arguing that judicial decisions construing precleared election law need not be precleared themselves, the intervenors rely heavily on *Williams v. Sclafani,* 444 F.Supp. 895 (S.D.N.Y.1977) (three-judge court).[3] In *Williams,* the New York City Board of Elections informed a plaintiff candidate that persons registering on the street pursuant to New York's recently enacted mail registration statute could simultaneously sign his designating petitions. In a subsequent suit in state court, the state supreme court held that the City Board's interpretation was erroneous and invalidated a number of the signatures on the plaintiff candidate's designating petitions. The district court held that "section 5 was not intended to cover a change in ... practice ... brought about by a state court decision construing or interpreting an already precleared state voting statute." *Id.* at 903. The intervenors argue that in this case, just as in *Williams,* the state's precleared election law was misinterpreted initially and that the state court's correction of the misinterpretation is not a change in practice that must be precleared.

*Williams* has no application to this case. First, the holding in *Williams* was based largely on that court's conclusion that all state court decrees are outside the coverage of section 5. *Id.* at 903–04. That holding was repudiated by the Supreme Court in *Hathorn v. Lavorn,* 457 U.S. 255, 102 S.Ct. 2421.

We note that the foundation of the intervenors' argument on this point is questionable. Careful analysis of the superior court order shows that the superior court did not construe the residency requirement —nor did it rule that the county officials lacked the authority under the statute to determine Keysville's boundaries—but instead held that, as a matter of fact, Keysville's boundaries could not be determined at all. That determination itself might be a change from the county officials' precleared conclusion that Keysville's boundaries could be determined.

---

2. It should also be pointed out that the preclearance itself had not changed the boundaries of Keysville either.

3. This decision is not a precedent binding upon this court.

Second, the intervenors argue that requiring preclearance of the superior court order, "by logical extension," will lead to pernicious results. The intervenors argue that if preclearance is required here, it should also be required of any state court order entered in an election contest that changes election results or requires new elections. That question is not before us and need not be decided here. We do, however, note a difference between the two situations: results of elections are not normally precleared. A successful election contest that effects a change in election results may not need to be precleared if the election contest itself were conducted pursuant to precleared election law on election challenges. In such a situation, cases such as *Williams* may continue to have some application. The intervenors also argue that requiring preclearance in cases such as this allows state officials, who would normally be without power to do so, to change municipality boundaries by submitting new boundaries for preclearance to the Attorney General. As the plaintiffs point out, however, it is highly unlikely that this course of events would ever occur and, if it were to happen, the improper but precleared boundaries may easily be changed by again submitting proper boundaries for preclearance.

Finally, the intervenors argue that if the superior court order must be precleared before being given effect, so that the January 4, 1988 election must be allowed to stand, the intervenors are without an adequate remedy for what they perceive to be a violation of state election law. Simply because the intervenors may not prevail in their post-election contest, presently pending in the state courts, however, does not render that remedy inadequate. Moreover, the intervenors remain free to petition their legislators to remedy the situation by legislatively defining the boundaries of Keysville.

## III. CONCLUSION.

In summary, the court concludes that its ruling on the plaintiffs' motion for a preliminary injunction was correct. The superior court order changed a previously pre-

cleared practice and therefore should also have been precleared. The plaintiffs' motion for a permanent injunction is GRANTED and the defendants are permanently enjoined from departing from the voting practices precleared by the Attorney General without obtaining preclearance for any subsequent changes, by judicial order or otherwise.