ROBERTSON, Justice, for the Court:
The Petition for Rehearing filed on behalf of appellant, Earl Daniels, is granted, and the opinion affirming the judgment against defendant Daniels, along with the two dissenting opinions, are withdrawn and the following opinion is substituted therefor:
Earl Daniels was indicted by the grand jury of the Circuit Court of Quitman County for the murder of Claude Jones on September 6, 1974. After a full trial, the jury returned a verdict of manslaughter, and the court sentenced Daniels to serve a term of ten years in the state penitentiary. Daniels appeals from the conviction and sentence. We reverse and remand for a new trial.
Prior to September 6, 1974, the date of the incident hereinafter related, defendant had rented a 160-acre tract of land from Mrs. Mable Gardner. Mrs. Gardner lived on the property in a house located about 250 feet east of a gravel road that runs north and south. Her house was reached by means of a gravel driveway. The defendant lived on a gravel road 428 feet north of the driveway leading to Mrs. Gardner’s home.
Prior to the date in question, Mrs. Gardner informed Daniels that she wanted to rent the farm on a cash basis rather than on a percentage basis. In the summer of 1974, she showed the place to prospective renters. On the morning of September 6, 1974, Daniels learned that Mrs. Gardner had leased the tract of land, for the coming year, to one Preston Bennett. Defendant went to see Mrs. Gardner and was angry that she had rented the land to someone else. He understood that Jones had advised Mrs. Gardner in connection with the Bennett lease, and stated to Mrs. Gardner at about 11:45 a.m.:
“That old sorry so and so down there has meddled in my business, and I’m going to get him if that’s the last thing I ever do.”
About 12:15 p.m., Daniels telephoned the Claude Jones residence. Jones’ wife answered the telephone and listened to the conversation on an extension while her husband talked to the defendant. Defendant told Jones, “I’m going to kill you if you cross me,” and then hung up.
Shortly before one o’clock, as Constable William B. Smith, defendant, and defendant’s brother, Boney, were talking around the dinner table, according to Smith, defendant said:
“A. Okay, he said, ‘Now, she better not cut that water off, because — ’ You know his water was supplied from her well. Earl says, ‘I’ll put a stick of dynamite in my line’, which if he blows up his water, it blows up hers too.”
About 2:30 p.m., Jones went to see Ben Caldwell, a former county prosecuting attorney, told him about Daniels’ threat, and sought his advice as to whether defendant should be placed under a peace bond. Jones *920 then went to see Sheriff L. Q. Brunt and reported the threat to him. Both Caldwell and Brunt were allowed to testify as to their conversations with Jones, including the purported threats made by Daniels against Jones.
About 3:15 p.m., Jones was talking to Mrs. Gardner in her yard when Daniels drove up to a shed which he used in connection with feeding his cattle. Daniels looked in the direction of Mrs. Gardner and Jones for a few minutes, then left, and went back to his home without feeding his cattle.
Daniels testified that he did return to his home, prepared three steaks, put them on the outdoor grill to cook, told his son, Robert, to look after the steaks while he went to feed the cattle, and then started back to the cattle shed.
Mrs. Gardner testified that she saw Daniels driving south toward her driveway at the same time that Jones was driving out of her driveway toward the north-south gravel road. She saw Jones speed up and turn south on the gravel road in the direction of his home. Daniels followed Jones’ car past Mrs. Gardner’s driveway, and, according to Mrs. Gardner, defendant “whipped around him and cut in on him and hit Mr. Jones’ car.”
Daniels disputes Mrs. Gardner’s version. He testified that just before he reached Mrs. Gardner’s driveway this happened:
“But, I didn’t even see the car until I got to this — you know where — just before I made my turn, and just as I got to this, well, here he comes at me, and he was, he was traveling at a high speed. So, I just come right on down the road here, and he come, come out of here and stopped.

“Q. All right, sir, now, as he came up here, you, instead of turning in, you went on down this way?
“A. Yes, sir.
“Q. Did you stop down that road, sir?
“A. Yes, sir.
“Q. At the time you stopped your vehicle, was the vehicle of Mr. Jones behind you or in front of you or to the side of you?
“A. It was behind me.
“Q. At that point, Hook, had there been any impact or contact between your vehicle at that time and the Jones’ vehicle?
“A. No, sir.
“Q. What happened after you stopped, and then you saw the car of Mr. Jones stopped back behind you?
“A. He got out of his car with his pistol.
“Q. Did you say or do anything?
“A. I begged him not to shoot me.
“Q. Can you tell us what you said if you remember?
“A. I don’t remember exactly, except I know I said, ‘Mr. Jones, don’t do that’, or ‘Don’t you shoot me’.
“Q. What were you doing then, were you getting out of your truck or sitting in your truck, or what were you doing?
“A. Well, I could have had the door open, or something, I don’t know at just at that particular time.
“Q. What do you remember after that?
“A. Nothing.”
The physical facts indicate that Jones’ car stopped at a point 128 feet south of the Gardner driveway, and defendant’s pickup truck, a short distance south of the Jones car. Jones’ pistol was a .32 caliber Colt automatic holding nine cartridges. Eight .32-caliber cartridge hulls were found in the roadway between the front of Jones’ car and the rear of Daniels’ pickup truck, and one .32-caliber cartridge hull was found in the bed of the defendant’s pickup truck. It is apparent that Jones fired first and emptied his .32-caliber automatic. Two bullets fired by Jones struck the defendant. One entered the back of Daniels’ left leg and exited on the front of his leg; the other entered his stomach to the right and somewhat higher than his umbilicus.
Jones’ body was found 29V2 feet south of the place where defendant’s truck had stopped. Jones had been shot one time, the *921 bullet entering the right armpit and exiting from the left armpit. A .25-caliber automatic pistol was found in Daniels’ truck with three live rounds still in it. Three .25-caliber hulls were found on the ground near the passenger’s side of defendant’s pickup truck. Three bullet holes were found in the interior of the door on the driver’s side of defendant’s truck; one bullet had exited from the exterior side of the door.
Robert Daniels, defendant’s 16-year-old son, testified that he looked up the road when he heard the shooting and saw his father shut the door to the truck and back up toward Mrs. Gardner’s driveway. He then stated:
“A. When he backed up, he scraped the front, or he scraped some part of the car, I remember it that, I don’t know what part it was, but it shook a little bit and uh—
“Q. —the car shook?
“A. Yes, sir, and then he backed into the driveway.
“Q. Which driveway was that?
“A. The one that goes out to Mrs. Gardner’s house.
“Q. And, then what did he do?
“A. Just came straight home.”
The ambulance attendants found defendant lying down in his front yard and took him to the hospital where he was immediately treated for his wounds. He remained in the hospital about 10 days.
Dr. Rubisoff, who received and treated Daniels at the hospital, testified:
“Q. Based on your clinical observation, did I understand you to say to the jury that the man didn’t know why he was at the hospital?
“A. Well, I can’t give you his exact words at this time, but my impression and my best recollection, provided I don’t have amnesia, is that the patient was sort of in a funk, he was sort of dazed. He wasn’t in gross — by that time he was not in gross physical shock, in other words, he had a fairly good blood pressure, pulse and so forth, but he looked rather confused, and I chose not to give him any details, . . . .”
Appellant admits that a jury issue was created by the conflicting testimony, but vigorously contends that he did not receive a fair trial because of prejudicial hearsay testimony admitted into evidence.
The trial court correctly excluded the testimony of Constable Smith as to Daniels’ saying that if Mrs. Gardner cut off the water to his home that he would “put a stick of dynamite in my line”. This remark was not a threat against anybody, and was in effect a retaliatory action that Daniels would take if Mrs. Gardner cut his water off.
Testimony was elicited from Sheriff Brunt as to Jones’ small size and Daniels’ huge size. This testimony should not have been admitted. There was no physical combat or contact between Jones and Daniels. The deadliness or the accuracy of a pistol does not depend upon the physical size of the one who pulls the trigger. A 150-pound man, or woman for that matter, can be just as accurate with a pistol as a 230-pound man.
The testimony of former county prosecuting attorney, Honorable Ben Caldwell, and the testimony of Sheriff Brunt as to Jones complaining to them of threats on his life by Earl Daniels should not have been admitted into evidence. It was hearsay testimony and was not part of the res gestae, as contended by the state.
Even if all the testimony of threats against Jones by Daniels and of Daniels running Jones off of the road, and that Jones was very much afraid of Daniels, were taken as true, still the action of Jones, in advancing upon Daniels as he sat in his truck and emptying his 9-shot .32-caliber Colt automatic pistol at Daniels and seriously wounding him, was not justified.
Even with the admission of this prejudicial testimony it took the jury nine hours to reach a verdict; this clearly indicated that it was a close and difficult ease to them. They were undoubtedly influenced by the improperly admitted evidence, and the ad *922 mission of this prejudicial testimony constituted fatal error.
We reverse the judgment against Daniels and remand this case for a new trial.
REVERSED AND REMANDED.
PATTERSON and INZER, P. JJ., and SMITH, SUGG, BROOM and LEE, JJ., concur.
GILLESPIE, C. J., and WALKER, J., dissent.