# HATHORN ET AL. v. LOVORN ET AL.

No. 81–451.   Argued April 27, 1982—Decided June 15, 1982

256

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, BLACKMUN, and STEVENS, JJ., joined. POWELL, J., concurred in the judgment. REHNQUIST, J., filed a dissenting opinion, *post*, p. 271.

*James C. Mayo* argued the cause and filed a brief for petitioners.

*Laurel G. Weir* argued the cause and filed a brief for respondents.

*Assistant Attorney General Reynolds* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Lee, Deputy Solicitor General Wallace, Barbara E. Etkind, Brian K. Landsberg,* and *Joan A. Magagna.*

JUSTICE O'CONNOR delivered the opinion of the Court.

We granted certiorari to decide whether a state court may order implementation of a change in election procedure over objections that the change is subject to preclearance under § 5 of the Voting Rights Act of 1965.[1]

## I

Since 1960, the Louisville School District has been coextensive with Winston County, Miss. Until last December, the Louisville mayor and city aldermen appointed three of the five members of the District's Board of Trustees, and Winston County voters residing outside Louisville elected the other two members.

In 1964, the Mississippi Legislature enacted a statute providing in part:

---

[1] Section 5 provides in relevant part:

"Whenever a [covered] State or political subdivision . . . shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, . . . such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided,* That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made. . . ." 79 Stat. 439, as amended, 42 U. S. C. § 1973c.

Section 4 of the Act, 79 Stat. 438, as amended, 42 U. S. C. § 1973b, defines covered jurisdictions.

"The boards of trustees of all municipal separate school districts, either with or without added territory, shall consist of five (5) members, each to be chosen for a term of five (5) years, but so chosen that the term of office of one (1) member shall expire each year. . . . [I]n any county in which a municipal separate school district embraces the entire county in which Highways 14 and 15 intersect, one (1) trustee shall be elected from each supervisors district." 1964 Miss. Gen. Laws, ch. 391, p. 563, codified, as amended, in Miss. Code Ann. § 37-7-203(1) (Supp. 1981).

Winston County is the only Mississippi county in which Highways 14 and 15 intersect. Officials in that county never implemented § 37-7-203(1) because they believed the statute's reference to Highways 14 and 15 violated a state constitutional prohibition against local, private, or special legislation.[2]

In 1975, five Winston County voters filed an action in the Chancery Court of Winston County,[3] seeking to enforce the neglected 1964 state statute.[4] These plaintiffs, respondents here, named numerous Louisville and Winston County officials as defendants. The Chancery Court dismissed respond-

---

[2] Mississippi Const., Art. 4, § 90, provides:

"The legislature shall not pass local, private, or special laws in any of the following enumerated cases, but such matters shall be provided for only by general laws, viz.:

. . . . .

"(p) Providing for the management or support of any private or common school, incorporating the same, or granting such school any privileges."

[3] The voters initially filed their suit in the United States District Court for the Northern District of Mississippi. That court stayed federal proceedings to give the Mississippi courts an opportunity to construe the state statute at issue. Record 320. In 1979, pursuant to a notice of voluntary dismissal by stipulation, the court dismissed the federal action without prejudice. *Id.*, at 323.

[4] The voters also charged that the electoral system then in force violated the constitutional principle of one person/one vote. This issue is not before us.

ents' complaint, holding that the statute violated Mississippi's constitutional bar against local legislation. The Mississippi Supreme Court reversed, striking only the specific reference to Highways 14 and 15 and upholding the remaining requirement that, "in any county in which a municipal separate school district embraces the entire county," each supervisors district must elect one trustee. *Lovorn* v. *Hathorn*, 365 So. 2d 947 (1979) (en banc). The court then "remanded to the chancery court for further proceedings not inconsistent with [its] opinion." *Id.*, at 952.

The local officials, petitioners here, filed a petition for rehearing, in which they argued for the first time that the Chancery Court could not implement the reformed statute until the change had been precleared under § 5 of the Voting Rights Act. The Mississippi Supreme Court denied the petition without comment, and this Court denied a petition for a writ of certiorari. *Hathorn* v. *Lovorn*, 441 U. S. 946 (1979).

On remand, the Chancery Court ordered an election pursuant to the redacted statute. The court set out detailed procedures governing the election, including the requirement that "[i]f no candidate receives a majority of the vote cast at any of said elections . . . , a runoff election shall be held . . . between the two candidates receiving the highest vote [in the first election]." Record 143. The court derived the latter requirement from Miss. Code Ann. § 37-7-217 (Supp. 1981), which mandates runoffs in elections conducted under § 37-7-203(1). See Miss. Code Ann. § 37-7-209 (Supp. 1981). The Chancery Court also agreed with petitioners' claim that the changes in election procedure fell within § 5 of the Voting Rights Act, and directed petitioners to submit the election plan to the United States Attorney General for preclearance. Record 141, 146-147.[5]

---

[5] As we have explained on numerous occasions, covered jurisdictions may satisfy § 5 by submitting proposed changes to the Attorney General. If the Attorney General objects to the proposal, the jurisdiction may either request reconsideration or seek a declaratory judgment from the United

Upon review of petitioners' submission, the Attorney General objected to the proposed change in election procedure "insofar as it incorporate[d] a majority vote requirement." App. to Pet. for Cert. A–8. Because of the substantial black population in Winston County,[6] an apparent pattern of racially polarized voting in the county, and the historical absence of blacks from various local governing boards, the Attorney General concluded that the runoff procedure could have a discriminatory effect. *Ibid.*[7]

Respondents attempted to overcome this obstacle by both joining the Attorney General as a defendant and persuading the Chancery Court to hold the election without the runoff procedure. The court, however, refused to join the Attorney General and held that state law unambiguously required runoff elections. Buffeted by apparently conflicting state and federal statutes, the Chancery Court concluded that its decree calling for an election would "remain in force subject to compliance with the Federal Voters Rights Act *[sic]* as previously ordered by this Court." Record 342.

Failing to obtain an election from the Chancery Court, respondents once again appealed to the Mississippi Supreme Court. That court observed that its "prior decision, which the United States Supreme Court declined to reverse or alter in any respect, became and is the law of the case." *Carter* v. *Luke*, 399 So. 2d 1356, 1358 (1981). The court explained that because the prior decision upheld a statute referring to the statute requiring runoffs, and because both parties had

---

States District Court for the District of Columbia. A covered jurisdiction, of course, also may seek a declaratory judgment in the first instance, omitting submission to the Attorney General. See generally *Blanding* v. *DuBose*, 454 U. S. 393 (1982); *Allen* v. *State Board of Elections*, 393 U. S. 544, 548–550 (1969).

[6] At that time, the Attorney General noted, blacks constituted approximately 39% of the Winston County population but were not a majority in any of the districts from which trustees were to be elected.

[7] The Attorney General also observed that the Louisville School District appears to be the only countywide district in which Mississippi requires runoff elections.

agreed during oral argument to abide by the runoff proce-
dure, the Chancery Court properly enforced the law re-
quiring runoffs and improperly conditioned the election on
compliance with the Voting Rights Act. Accordingly, the
Mississippi Supreme Court reversed the portion of the Chan-
cery Court's decree referring to the Voting Rights Act and
"remanded with directions for the lower court to call and re-
quire the holding of an election." *Ibid.* We granted certio-
rari to decide whether the Mississippi Supreme Court prop-
erly ordered the election without insuring compliance with
federal law. 454 U. S. 1122 (1981).[8]

## II

Before addressing the federal question raised by the Mis-
sissippi Supreme Court's decision, we must consider respond-
ents' assertion that the lower court decision rests upon two
adequate and independent state grounds. First, respond-
ents contend that the state court's reliance upon the law of
the case bars review of the federal question. It has long
been established, however, that "[w]e have jurisdiction to
consider all of the substantial federal questions determined in
the earlier stages of [state proceedings], . . . and our right to
re-examine such questions is not affected by a ruling that
the first decision of the state court became the law of the
case . . . ." *Reece* v. *Georgia,* 350 U. S. 85, 87 (1955). See
also *Davis* v. *O'Hara,* 266 U. S. 314, 321 (1924); *United*

---

[8] Shortly before petitioners filed their petition for certiorari, the Chan-
cery Court set an election for December 5, 1981. That court, the Missis-
sippi Supreme Court, and this Court denied motions to stay the election.
See 454 U. S. 1070 (1981). On December 1, the United States filed suit in
the United States District Court for the Northern District of Mississippi,
seeking to enjoin implementation of the voting change involved in this case.
The District Court refused to issue a temporary restraining order and has
not taken any other action.

The December 5 election was held as scheduled. Although the record
does not reflect the results of the election, the United States has informed
us that a runoff election was held. Brief for United States as *Amicus Cu-
riae* 10, n. 12.

*States* v. *Denver & Rio Grande R. Co.*, 191 U. S. 84, 93 (1903). Because we cannot review a state court judgment until it is final,[9] a contrary rule would insulate interlocutory state court rulings on important federal questions from our consideration.

In this case the Mississippi Supreme Court's first decision plainly did not appear final at the time it was rendered. The court's remand "for further proceedings not inconsistent with [its] opinion," 365 So. 2d, at 952 (en banc), together with its failure to address expressly the Voting Rights Act issue, suggested that the Chancery Court could still consider the federal issue on remand. Indeed, the Chancery Court interpreted its mandate in precisely this manner.[10] Under these circumstances, the Mississippi Supreme Court's subsequent reliance on the law of the case cannot prevent us from reviewing federal questions determined in the first appeal.[11]

Respondents also argue that the Mississippi Supreme Court pretermitted consideration of the Voting Rights Act because petitioners' reliance upon the issue in a petition for rehearing was untimely. We have recognized that the failure to comply with a state procedural rule may constitute an independent and adequate state ground barring our review of a federal question.[12] Our decisions, however, stress that a

---

[9] 28 U. S. C. § 1257; *O'Dell* v. *Espinoza*, 456 U. S. 430 (1982); *Market Street R. Co.* v. *Railroad Comm'n of California*, 324 U. S. 548, 551 (1945).

[10] The Chancellor, in fact, noted that it "would have been impossible to have submitted to the Attorney General for approval until this Court had set up the mechanics of the election, for until that was done, the Attorney General would not have the data necessary to either approve or disapprove." Record 90–91.

[11] Nor, of course, does our previous denial of petitioners' petition for a writ of certiorari preclude us from examining questions decided during the first state appeal. It is "well-settled . . . that denial of certiorari imparts no implication or inference concerning the Court's view of the merits." *Hughes Tool Co.* v. *Trans World Airlines, Inc.*, 409 U. S. 363, 366, n. 1 (1973).

[12] *E. g.*, *Michigan* v. *Tyler*, 436 U. S. 499, 512, n. 7 (1978); *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 264, n. 4 (1964).

state procedural ground is not "adequate" unless the procedural rule is "strictly or regularly followed." *Barr* v. *City of Columbia*, 378 U. S. 146, 149 (1964). State courts may not avoid deciding federal issues by invoking procedural rules that they do not apply evenhandedly to all similar claims. Even if we construe the Mississippi Supreme Court's denial of petitioners' petition for rehearing as the silent application of a procedural bar, we cannot conclude that the state court consistently relies upon this rule.

Respondents cite two cases indicating that the Mississippi Supreme Court will consider an issue raised for the first time in a petition for rehearing "[o]nly in exceptional cases." *New & Hughes Drilling Co.* v. *Smith*, 219 So. 2d 657, 661 (Miss. 1969); *Rigdon* v. *General Box Co.*, 249 Miss. 239, 246, 162 So. 2d 863, 864 (1964). Although these opinions may summarize the court's practice prior to 1969, we have been unable to find any more recent decisions repeating or applying the rule.[13] On the contrary, the Mississippi Supreme Court now regularly grants petitions for rehearing without mentioning any restrictions on its authority to consider issues raised for the first time in the petitions.[14]

---

[13] In *New & Hughes Drilling Co.* itself, the Mississippi Supreme Court permitted an exception to the alleged rule barring review of questions raised for the first time on rehearing. A case decided the same year as *New & Hughes Drilling Co.* is the most recent decision we have found that might have actually applied the procedural rule described by respondents. See *Leake County Cooperative* v. *Dependents of Barrett*, 226 So. 2d 608, 614–616 (Miss. 1969). Even that decision, however, may have rested upon a special rule involving waiver of defects in venue.

Neither the Mississippi Code nor the Rules of the Supreme Court of Mississippi embody the alleged prohibition against presentation of new issues in petitions for rehearing. Under these circumstances, it is difficult to know whether the Mississippi Supreme Court still adheres to the rule, applying it silently, or whether the court has abandoned the rule.

[14] See, *e. g., Cortez* v. *Brown*, 408 So. 2d 464 (1981) (en banc); *Cash* v. *Illinois Central Gulf R. Co.*, 388 So. 2d 871 (1980) (en banc); *McKee* v. *McKee*, 382 So. 2d 287 (1980) (en banc); *City of Jackson* v. *Capital Reporter Publishing Co.*, 373 So. 2d 802 (1979) (en banc); *Realty Title Guaranty Co.* v. *Howard*, 355 So. 2d 657 (1977) (en banc); *Couch* v. *Martinez*,

One particular decision by the Mississippi Supreme Court, decided only last year, demonstrates that the court does not consistently preclude consideration of issues raised for the first time on rehearing. In *Quinn* v. *Branning,* 404 So. 2d 1018 (1981), the court held that part of a criminal statute violated the State Constitution's prohibition against local legislation. Striking the offensive language, the court approved the rest of the statute and affirmed the underlying conviction. The defendant then petitioned for rehearing, pointing out that the affidavit against him did not allege a crime under the reformed statute. The court agreed with this contention, granted the petition in part, and reversed the conviction, all without mentioning the rule against consideration of new issues on rehearing. The striking similarity between *Quinn* and this case, both involving issues that the parties could have foreseen but that arose with urgency only after the court upheld part of a challenged statute, persuades us that the Mississippi Supreme Court is not "strictly or regularly" following a procedural rule precluding review of issues raised for the first time in a petition for rehearing. The denial of rehearing in this case, although not appearing sufficiently final to permit our immediate review, must have rested either upon a substantive rejection of petitioners' federal claim or upon a procedural rule that the state court ap-

---

357 So. 2d 107 (1978) (en banc); *Foster* v. *Foster,* 344 So. 2d 460 (1977) (en banc); *McCrory* v. *State,* 342 So. 2d 897 (1977) (en banc); *Daniels* v. *State,* 341 So. 2d 918 (1977) (en banc); *Mississippi State Highway Comm'n* v. *Gresham,* 323 So. 2d 100, 103 (1975) (en banc); *Powers* v. *Malley,* 302 So. 2d 262, 264 (1974).

In *Mississippi State Highway Comm'n* v. *Gresham, supra,* the court expressly noted that its disposition depended upon a fact mentioned for the first time in the petition for rehearing. In several other decisions, the type of question considered on rehearing suggests that it was raised for the first time by the party petitioning for that relief. *E. g., Cortez* v. *Brown, supra; City of Jackson* v. *Capital Reporter Publishing Co., supra; Powers* v. *Malley, supra.* These decisions, however, do not expressly acknowledge the novelty of the points raised on rehearing.

plies only irregularly.[15]  Thus, there are no independent and adequate state grounds barring our review of the federal issue.

## III

Respondents do not dispute that the change in election procedures ordered by the Mississippi courts is subject to preclearance under §5.[16]  They urge, however, that the Voting

---

[15] Respondents also contend that our decisions establish a general rule against review of questions presented for the first time in a petition for rehearing.  We have recognized that, under many circumstances, "[q]uestions first presented to the highest State court on a petition for rehearing come too late for consideration here." *Radio Station WOW, Inc.* v. *Johnson*, 326 U. S. 120, 128 (1945).  At the same time, however, we have explained that this bar does not apply if "the State court exerted its jurisdiction in such a way that the case could have been brought here had the questions been raised prior to the original disposition." *Ibid.*  In this case we conclude that the Mississippi Supreme Court's first judgment on appeal either decided the federal question on the merits, although in a manner that did not appear final, or avoided the federal question by invoking an inconsistently applied procedural rule.  If petitioners had made their claim prior to the court's original disposition, either of these circumstances would have permitted us to review the federal question.

[16] Mississippi plainly is one of the jurisdictions covered by the statute. *South Carolina* v. *Katzenbach*, 383 U. S. 301, 318 (1966); 30 Fed. Reg. 9897 (1965).  The Louisville School District Board of Trustees, like all political entities within the State, accordingly must comply with §5's strictures.  See *Dougherty County Board of Education* v. *White*, 439 U. S. 32, 46 (1978); *United States* v. *Board of Commissioners of Sheffield*, 435 U. S. 110 (1978).  It is immaterial that the change sought by respondents derives from a statute that predates the Voting Rights Act, because §5 comes into play whenever a covered jurisdiction departs from an election procedure that was "*in fact* 'in force or effect' . . . on November 1, 1964." *Perkins* v. *Matthews*, 400 U. S. 379, 395 (1971) (emphasis in original).

Finally, the presence of a court decree does not exempt the contested change from §5.  We held only last Term that §5 applies to any change "reflecting the policy choices of the elected representatives of the people," even if a judicial decree constrains those choices. *McDaniel* v. *Sanchez*, 452 U. S. 130, 153 (1981).  Although *McDaniel* involved a reapportionment plan drafted pursuant to a federal court's order, its interpretation of §5 is equally instructive here.  When state or local officials comply with a

Rights Act deprives state courts of the power even to decide whether § 5 applies to a proposed change in voting procedures.[17] Under their analysis of the Act, a state court asked to implement a change in the State's voting laws could not inquire whether the change was subject to § 5. Even if the change plainly fell within § 5, the court would have to ignore that circumstance and enter a decree violating federal law. Both the language and purposes of the Voting Rights Act refute this notion.

Only last Term we summarized the principles governing state court jurisdiction to decide federal issues. *Gulf Offshore Co.* v. *Mobil Oil Corp.*, 453 U. S. 473 (1981). We begin, in every case, "with the presumption that state courts enjoy concurrent jurisdiction" over those claims. *Id.*, at 478. Only "an explicit statutory directive, [an] unmistakable implication from legislative history, or . . . a clear incompatibility between state-court jurisdiction and federal interests" will rebut the presumption. *Ibid.* Most important for our purposes, even a finding of exclusive federal jurisdiction over claims arising under a federal statute usually "will not prevent a state court from deciding a federal question collaterally." *Id.*, at 483, n. 12.[18]

---

court order to enforce a state statute, there is no doubt that their actions "reflec[t] the policy choices of . . . elected representatives." Indeed, if § 5 did not encompass this situation, covered jurisdictions easily could evade the statute by declining to implement new state statutes until ordered to do so by state courts. Cf. *McDaniel* v. *Sanchez, supra,* at 151 (noting that "if covered jurisdictions could avoid the normal preclearance procedure by awaiting litigation challenging a refusal to redistrict after a census is completed, [§ 5] might have the unintended effect of actually encouraging delay in making obviously needed changes in district boundaries"). In light of *McDaniel,* we conclude that a state court decree directing compliance with a state election statute contemplates "administ[ration]" of the state statute within the meaning of § 5.

[17] Respondents do not claim that Mississippi law restricts the state courts' power to decide questions related to § 5.

[18] We frequently permit state courts to decide "collaterally" issues that would be reserved for the federal courts if the cause of action arose directly

Respondents rest their jurisdictional argument on three sections of the Act. Section 14(b) provides that "[n]o court other than the District Court for the District of Columbia . . . shall have jurisdiction to issue any declaratory judgment pursuant to . . . section 5 . . . ." 79 Stat. 445, 42 U. S. C. § 1973*l*(b). We have already held, however, that this provision governs only declaratory judgments approving proposed changes in voting procedure. Other courts may decide the distinct question of whether a proposed change is subject to the Act. See *Allen* v. *State Board of Elections*, 393 U. S. 544, 557–560 (1969); *McDaniel* v. *Sanchez*, 452 U. S. 130 (1981).

Sections 5 and 12(f) of the Act provide somewhat stronger support for respondents' claim. Section 5 provides that "[a]ny action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of title 28 of the United States Code," 79 Stat. 439, 42 U. S. C. § 1973c, while § 12(f) declares that "[t]he district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this section." 79 Stat. 444, 42 U. S. C. § 1973j(f).[19] It is possible that these sections grant the federal courts exclusive jurisdiction over

under federal law. For example, the state courts may decide a variety of questions involving the federal patent laws. *American Well Works Co.* v. *Layne & Bowler Co.*, 241 U. S. 257 (1916); *New Marshall Engine Co.* v. *Marshall Engine Co.*, 223 U. S. 473 (1912); *Pratt* v. *Paris Gas Light & Coke Co.*, 168 U. S. 255 (1897). Similarly, although state courts lack jurisdiction to entertain suits brought pursuant to § 4 of the Clayton Act, 15 U. S. C. § 15, they often decide issues concerning the federal antitrust laws in other contexts. See, *e. g.*, *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97 (1980); *Bement* v. *National Harrow Co.*, 186 U. S. 70 (1902), quoted with approval in *Kaiser Steel Corp.* v. *Mullins*, 455 U. S. 72, 81–82, n. 7 (1982). See generally Note, Exclusive Jurisdiction of the Federal Courts in Private Civil Actions, 70 Harv. L. Rev. 509, 510–511 (1957).

[19] Section 12(d) authorizes preventive relief against persons "engaged or . . . about to engage in any act or practice prohibited by" designated sections of the Voting Rights Act. 79 Stat. 444, 42 U. S. C. § 1973j(d).

"action[s] under" § 5 or "proceedings instituted pursuant" to § 12.[20] We need not resolve that question in this case, however, because respondents' state suit fell within neither of these categories. Instead, respondents' initial suit was an action to compel compliance with a forgotten state law.[21] Nothing in § 5 or § 12 negates the presumption that, at least when the issue arises collaterally, state courts may decide whether a proposed change in election procedure requires preclearance under § 5.

The policies of the Act support the same result.[22] The Voting Rights Act "implemented Congress' firm intention to rid the country of racial discrimination in voting." *Allen* v. *State Board of Elections, supra*, at 548. Fearing that covered jurisdictions would exercise their ingenuity to devise new and subtle forms of discrimination, Congress prohibited those jurisdictions from implementing any change in voting procedure without obtaining preclearance under § 5. Granting state courts the power to decide, as a collateral matter, whether § 5 applies to contemplated changes in election procedures will help insure compliance with the preclearance scheme.[23] Approval of this limited jurisdiction also avoids

---

[20] At least one state court has ruled that it lacks jurisdiction over claims arising under the Voting Rights Act. *Ortiz* v. *Thompson*, 604 S. W. 2d 443 (Tex. Civ. App. 1980). See also *Beatty* v. *Esposito*, 411 F. Supp. 107 (EDNY 1976) (finding that state court lacked jurisdiction to decide § 5 issue, without explaining whether state suit arose under the Voting Rights Act).

[21] Respondents also based their suit on the Fourteenth Amendment. See n. 4, *supra*.

[22] Neither the parties nor the United States, appearing as *amicus curiae*, has cited any legislative history bearing upon state court jurisdiction to decide issues arising under the Voting Rights Act.

[23] As respondents point out, state court jurisdiction to decide these collateral issues is not absolutely necessary to effectuate the Act's scheme, because interested parties have the ability to seek relief from a federal district court. Recognition of a limited state power to address § 5 issues, however, furthers the Act's ameliorative purposes by permitting additional tribunals to enforce its commands. It also insures that the question of cov-

placing state courts in the uncomfortable position of ordering voting changes that they suspect, but cannot determine, should be precleared under § 5. Accordingly, we hold that the Mississippi courts had the power to decide whether § 5 applied to the change sought by respondents.

If the Mississippi courts had the power to make this determination, then it is clear that they also had the duty to do so. "State courts, like federal courts, have a constitutional obligation . . . to uphold federal law." *Stone* v. *Powell*, 428 U. S. 465, 494, n. 35 (1976) (citing *Martin* v. *Hunter's Lessee*, 1 Wheat. 304, 341–344 (1816)). Section 5 declares that whenever a covered jurisdiction shall "enact or seek to administer any . . . standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964," see n. 1, *supra*, it must obtain either preclearance from the Attorney General or a declaratory judgment from the United States District Court for the District of Columbia. Our opinions repeatedly note that failure to follow either of these routes renders the change unenforceable. See, *e. g.*, *Dougherty County Board of Education* v. *White*, 439 U. S. 32, 46 (1978); *United States* v. *Board of Supervisors*, 429 U. S. 642, 645 (1977) *(per curiam)*. When a party to a state proceeding asserts that § 5 renders the con-

---

erage will be addressed at the earliest possible time, without requiring duplicative lawsuits.

We find little force in respondents' claim that, if the state courts possess jurisdiction to decide § 5 issues arising in disputes between private parties, they will frustrate the Attorney General's enforcement of the Act by interpreting the preclearance requirement conservatively. The Attorney General is not bound by the resolution of § 5 issues in cases to which he was not a party. *City of Richmond* v. *United States*, 422 U. S. 358, 373–374, n. 6 (1975). Common notions of collateral estoppel suggest that the state proceedings similarly would not bind other interested persons who did not participate in them. See Restatement (Second) of Judgments § 68 (Tent. Draft No. 4, Apr. 15, 1977). Persons dissatisfied with a state court's collateral resolution of a § 5 issue in proceedings involving other parties, therefore, are likely to be able to litigate the issue anew in federal court.

templated relief unenforceable, therefore, the state court must examine the claim and refrain from ordering relief that would violate federal law.[24]

## IV

Our holding mandates reversal of the lower court judgment.   Under our analysis, the change in election procedure is subject to § 5, see n. 16, *supra*, and the Mississippi courts may not further implement that change until the parties comply with § 5.   At this time, however, we need not decide whether petitioners are entitled to any additional relief. The United States has initiated a federal suit challenging the change at issue here, see n. 8, *supra*, and we agree with the Solicitor General that the District Court entertaining that suit should address the problem of relief in the first instance. As we noted in *Perkins* v. *Matthews*, 400 U. S. 379, 395–397 (1971), a local district court is in a better position than this Court to fashion relief, because the district court "is more familiar with the nuances of the local situation" and has the opportunity to hear evidence.   *Id.*, at 397.   In this case, the District Court for the Northern District of Mississippi will be better able to decide whether a special election is necessary, whether a more moderate form of interim relief will satisfy § 5,[25] or whether new elections are so imminent that special relief is inappropriate.   We hold only that the Mississippi

---

[24] Our holding does not prevent state courts from attempting to accommodate both state and federal interests.   A state court, for example, might adopt the approach followed by the Chancery Court in this case, and order the parties to submit the proposed relief to the Attorney General. If the Attorney General registers an objection, the court might then order the parties to seek a declaratory judgment from the District Court for the District of Columbia.

[25] For example, since the Attorney General objected only to the runoff procedure, the District Court simply might void the results of any runoff elections, permitting the candidates who gathered a plurality of votes in the general election to take those seats.   We, of course, intimate no view on the best form of relief, leaving that matter to the District Court's discretion.

courts must withhold further implementation of the disputed change in election procedures until the parties demonstrate compliance with § 5. Accordingly, the judgment of the Mississippi Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*So ordered.*

JUSTICE POWELL concurs in the judgment.

JUSTICE REHNQUIST, dissenting.

The provisions of §§ 5, 12(f), and 14(b) of the Voting Rights Act, referred to in the opinion of the Court, *ante*, at 265–268, convince me that Congress did not intend the state courts to play a role in the enforcement of that Act. In *Gulf Offshore Co.* v. *Mobil Oil Corp.*, 453 U. S. 473 (1981), upon which the Court heavily relies for its contrary conclusion, we said:

> "The factors generally recommending exclusive federal-court jurisdiction over an area of federal law include the desirability of uniform interpretation, the expertise of federal judges in federal law, and the assumed greater hospitality of federal courts to peculiarly federal claims." *Id.*, at 483–484 (footnotes omitted).

It seems to me that each of these factors counsels in favor of exclusive federal-court jurisdiction, and I do not understand the Court to contend otherwise.

From a practical point of view, I think the Court's decision is bound to breed conflicts between the state courts and the federal district courts sitting within the States, each of which may now determine whether or not a particular voting change must be precleared with the Attorney General before being enforced in a covered jurisdiction. Indeed, the precursor of such conflict may well be found in the Court's concluding observations that the District Court for the Northern District of Mississippi, in which the United States has pending a suit pertaining to the change involved in this case, should proceed to make determinations under the Voting

Rights Act before the state court whose judgment we are reviewing renders further remedy in this case. Exactly what is to be left to the States under this construction is more than a little problematical.

I do not think that the goals of the Voting Rights Act will be materially advanced by the Court's somewhat tortured effort to make the state courts a third line of enforcement for the Act, after the District Court for the District of Columbia and other federal district courts. The principal effect of today's decision will be to enable one or the other of parties such as those involved in this case, neither of whom were intended to be primary beneficiaries of the Voting Rights Act, to employ the Act as another weapon in their arsenal of litigation strategies.