**Robert T. HUGGINS,**
**Plaintiff-Appellant,**

v.

**John ISENBARGER, Chairman,**
**Indiana Parole Board,**
**Defendant-Appellee.**

No. 85–3036.

United States Court of Appeals,
Seventh Circuit.

Submitted June 24, 1986.

Decided Aug. 8, 1986.

Robert T. Huggins, pro se.

Kermit R. Hilles, Deputy Atty. Gen., Indianapolis, Ind., for defendant-appellee.

Before CUMMINGS, Chief Judge, and CUDAHY and EASTERBROOK, Circuit Judges.

PER CURIAM.

Sentenced in 1964 to life in prison for first degree murder, Robert Huggins has tried to secure release by clemency or parole. Five times the Governor of Indiana declined to commute Huggins' sentence. In 1984, after serving 20 years, he became eligible for parole. So far the state's parole board has declined at least thrice to release Huggins. Each time the board sent Huggins a form preprinted "it was the decision of the Indiana Parole Board not to grant parole at this time for the following reasons" followed by a handlettered notation. The notation for February 1984 is: "SeRIOUSness of offense." The notation for February 1985 is: "A—Seriousness of the offense". There is no "B".

Insisting that the state had paroled or granted clemency to other murderers, Huggins filed this suit under 42 U.S.C. § 1983, arguing that the due process clause of the fourteenth amendment entitles him to a better reason. As he puts it, "seriousness of the offense" is "too broad and general to comply with due process." In this circuit, at least, such a contention may be raised in § 1983 litigation as well as habeas corpus. *Walker v. Prisoner Review Board,* 694 F.2d 499, 501 (7th Cir. 1982). See also *In re United States Parole Commission,* 793 F.2d 338 (D.C.Cir. 1986). But cf. *Billiteri v. United States Board of Parole,* 541 F.2d 938, 946–47 (2d Cir.1976); *Bijeol v. Benson,* 513 F.2d 965, 967 (7th Cir.1975).

The district court concluded that Indiana's parole statutes and regulations do not establish a "liberty" or "property" interest within the meaning of the due process clause, and it therefore dismissed the complaint for failure to state a claim on which relief may be granted. The court observed that *Averhart v. Tutsie,* 618 F.2d 479, 480–82 (7th Cir.1980), had come to this conclusion about Indiana's system. Although there had been amendments to Indiana's statute and rules since *Averhart,* the court relied on *Higgason v. Duckworth,* 573 F.Supp. 669, 670–71 (N.D.Ind. 1983), which concluded that the amended system still does not establish a "liberty" or "property" interest. The principal question for decision is whether *Higgason* is correct.

The statute in force until October 1980, Ind.Code § 11–1–1–9, entitled the prisoner to appear before the parole board (§ 11–1–1–9(c)) and required the board to "consider all pertinent information regarding each prisoner ... including the circumstances of his offense, his previous social history and criminal record, his conduct, employment, and attitude in prison, and the reports of such physical and mental examinations as have been made." Ind.Code § 11–1–1–9(b). The only rules guiding the board's exercise of discretion stated: "A parole shall be

ordered only for the best interest of society, not as an award of clemency; it shall not be considered to be a reduction of sentence or pardon. A prisoner shall be placed on parole only when arrangements have been made for his proper employment, or for his maintenance and care, and only when the Indiana parole board believes that he is able and willing to fulfill the obligations of a law-abiding citizen." Ind.Code § 11-1-1-9(c). The Supreme Court of Indiana, interpreting this statute, held that "our Legislature has invested the Parole Board with almost total discretion in such matters." *Murphy v. Indiana Parole Board,* 272 Ind. 200, 397 N.E.2d 259, 263 (1979).

■ The decision of the Supreme Court of Indiana made for an easy analysis under *Greenholtz v. Inmates of the Nebraska Penal and Correctional Center,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). *Greenholtz* established that a prisoner's desire to be released on parole is neither liberty nor property within the meaning of the due process clause unless the state establishes an entitlement that depends on the application of rules to facts. If parole is discretion and nothing but, then there is no liberty or property interest. If rules of law require the parole officials to act in specified ways, then there is a protected interest, a "legitimate claim of entitlement". *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The essential ingredient is "an entitlement that stands or falls on the application of rules to facts. To the extent a request appeals to discretion rather than to rules, there is no property." *Scott v. Village of Kewaskum,* 786 F.2d 338, 339-40 (7th Cir.1986). See also *Achacoso-Sanchez v. INS,* 779 F.2d 1260, 1264 (7th Cir.1985). Because the judgment of conviction removes, for the duration of the sentence, the prisoner's "natural" liberty, the right to freedom that antedates governments, the definition of a liberty interest in parole or other early release is the same as the definition of a property interest. See *Greenholtz,* 442 U.S. at 11-12, 99 S.Ct. at 2105-06. Indiana's former parole statute,

as the Supreme Court of Indiana understood it, did not call for the application of rules to facts but left parole officials with unbounded discretion.

The new statute, like the old, requires the parole board to meet with the prisoner and to consider his background. Ind.Code § 11-13-3-3(b), (i). Two new provisions restrict the board's discretion. Section 11-13-3-3(h) provides that the board "shall adopt rules, under IC 4-22-2, and make available to offenders the criteria considered in making parole release determinations. The criteria must include the: (1) nature and circumstances of the crime for which the offender is committed; (2) offender's prior criminal record; (3) offender's conduct and attitude during commitment; and (4) offender's parole plan." With these criteria in mind, the board must decide whether to release an applicant. The statute does not say what combination of criteria requires release. It does say (§ 11-13-3-3(j)):

> If parole is denied, the parole board shall give the person written notice of the denial and the reasons for the denial. The parole board may not parole a person if it determines that there is a substantial reason to believe that he:
>
> (1) will engage in further specified criminal activity; or
>
> (2) will not conform to appropriate specified conditions of parole.

Huggins argues that this statute means that the board shall release an eligible prisoner *unless* he will "engage in further specified criminal activity" or "will not conform to appropriate specified conditions of parole." If so, the new statute establishes a liberty or property interest under the analysis of *Greenholtz.*

■ *United States ex rel. Scott v. Illinois Parole and Pardon Board,* 669 F.2d 1185 (7th Cir.), *cert. denied,* 459 U.S. 1048, 103 S.Ct. 468, 74 L.Ed.2d 617 (1982), held that a statute with a structure similar to the new Indiana law does restrict the parole officials' discretion and establish a liberty or property interest. This case shows,

however, that a similar structure is not enough to require an identical outcome. The district court, whose interpretation of Indiana law deserves some deference, concluded that it does not. We read the Illinois statute in *Scott* as confining the parole officials' discretion, granting that the same language could be read differently. 669 F.2d at 1189. Indiana's language must be read differently.

Section 11–13–3–3(j) is phrased in the negative; it sometimes forbids release but never requires release. The regulations issued under § 11–13–3–3(h) could restrain the board's discretion, which would establish a liberty or property interest, see *Hewitt v. Helms*, 459 U.S. 460, 471–72, 103 S.Ct. 864, 871–72, 74 L.Ed.2d 675 (1983), but they do not. The regulations, codified at 220 I.A.C. § 1.1–2–3, enlarge the list of considerations beyond those enumerated in § 11–13–3–3(h), but they do not attach weights to any factor or fetter the board's discretion in the least. The substantive regulation, 220 I.A.C. § 1.1–2–3(j), tracks the statutory language by sometimes forbidding parole but never requiring parole. Neither the statute nor any regulation requires the board to give a particular reason for denying parole. It may, for example, give a reason that is not among the two criteria that compel it (under § 11–13–3–3(j)) to deny parole. This is enough to establish that the statute leaves the parole officials with discretion.

It is not important that the statute and regulation require the parole board to hold meetings with applicants for parole. Liberty or property is defined by the substantive criteria that guide the decision, not by the procedural trappings. *Hewitt*, 459 U.S. at 471, 103 S.Ct. at 875; *Olim v. Wakinekona*, 461 U.S. 238, 248–51, 103 S.Ct. 1741, 1747–48, 75 L.Ed.2d 813 (1983). Cf. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 1491–93, 84 L.Ed.2d 494 (1985). It is also unimportant that the board releases many murderers. The essential liberty or property interest comes from rules, not from empirical regularities under discretionary regimes. Connecticut pardoned or granted clemency to a

very large portion of its prisoners, yet this did not establish a liberty or property interest when the executive officials retained full discretion in each case. *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981).

We recognize that some decisions seem to look the other way, holding that just about any time a law or regulation gives parole officials a list of things to consider it has established a liberty or property interest. E.g., *Parker v. Corrothers*, 750 F.2d 653 (8th Cir.1984). But still other courts have come to the conclusion we did in *Averhart*, that only when the state's system significantly restricts the parole officials' discretion and grants a legitimate claim of entitlement to parole has the state created a liberty or property interest. E.g., *Berard v. Vermont Parole Board*, 730 F.2d 71 (2d Cir.1984). *Berard*, *Averhart*, and like cases capture the meaning of *Greenholtz*, *Dumschat*, *Hewitt*, and the Supreme Court's other recent decisions. We therefore adhere to *Averhart*. Under the analysis of that case, the new Indiana regime (as the Executive Branch of Indiana interprets and administers that regime) is no different from the old, and a prisoner has neither a liberty nor a property interest in his application for parole.

■ Only one issue remains. Huggins apparently maintains that the state's system violates the equal protection clause of the fourteenth amendment, both because some prisoners are released while others are not, and because some prisoners (those sentenced for crimes committed after 1977) are released automatically. Huggins does not say that the state treats one class of prisoners differently from any other, so the point that some are let out and some are kept in is a truism rather than a legal objection. The change in 1977 is attributable to Indiana's decision to adopt a system of determinate sentences, as the federal courts soon will under legislation enacted in 1984. Determinate sentences abolish discretionary parole; parole officials then simply monitor people released on good

time credits. The observation that people sentenced under a system of determinate sentences are released "automatically" at some time does not show that people sentenced under a different system are entitled to be let go. Indeed the ex post facto clause of the Constitution may prevent the application to Huggins of today's system. Cf. *Weaver v. Graham,* 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981). It does not violate the equal protection clause to require people sentenced before 1977 to serve out their sentences under the system that was in place when they committed their crimes. *Raimondo v. Belletire,* 789 F.2d 492, 497 (7th Cir.1986).

AFFIRMED

EASTERBROOK, Circuit Judge, concurring.

Ind.Code § 11–13–3–3 is a state law, and as in so many diversity cases our job is to figure out the meaning of a state's law while the state courts remain silent. That we must interpret the law is a consequence of litigation under § 1983. The exhaustion of state remedies required prior to a petition for habeas corpus would have given Indiana's courts an opportunity to construe the new statute. I doubt that cases of this sort should be brought under § 1983. Huggins wants out, sooner or later; just as a criminal defendant seeking a new trial must use habeas corpus, so a prisoner seeking a new parole hearing should. See *Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973); *Hanson v. Heckel,* 791 F.2d 93 (7th Cir.1986); *United States ex rel. Johnson v. McGinnis,* 734 F.2d 1193 (7th Cir.1984). But while *Walker* governs, § 1983 is an available avenue, and we are driven to construe state law without the guidance of the state's courts.

What should we make of the new statute? No court of Indiana has decided whether the new statute restricts the parole officials' discretion. Indiana could interpret its law as Huggins does. We held in *Scott* that a similar statute creates a liberty or property interest. The legislative history in Indiana might show that the

parole officials are to grant release whenever release is not forbidden. There is no inevitable reading of a complex statute. Context and history tell the story, which is why statutory construction is an art rather than a science.

Our task is affected by the fact that although diversity litigation usually is between private parties, with the state as neutral lawgiver, this suit is against the state. We do not have an interpretation of § 11–13–3–3 from the Judicial Branch of Indiana, but we have an interpretation from the state's Executive Branch. The parole officials interpret § 11–13–3–3 to give them discretion to deny parole based on the seriousness of the offense, a criterion not listed in § 11–13–3–3(j), which demonstrates that they do not read that statute as directing release whenever release is not forbidden. The Attorney General of Indiana interprets the new statute as granting parole officials the same unbridled discretion as the old one did. The Attorney General's brief in this court states that neither the new statute nor any of its implementing regulations constrains the board to grant parole under any set of facts.

If the Supreme Court of Indiana had come to this conclusion, our case would be as easy as *Averhart* was. To what extent does the Attorney General's interpretation of § 11–13–3–3 fill the gap? We cannot proceed as if the matter were open to utterly independent consideration. No rule of federal law requires states to confide certain powers to the judicial branch alone. However Indiana wishes to distribute its powers internally, this is no concern of the federal government unless the distribution denies the state a republican form of government. See *Whalen v. United States,* 445 U.S. 684, 689 n. 4, 100 S.Ct. 1432, 1436 n. 4, 63 L.Ed.2d 715 (1980); *Mayor of Philadelphia v. Educational Equal Opportunity League,* 415 U.S. 605, 615 n. 13, 94 S.Ct. 1323, 1330 n. 13, 39 L.Ed.2d 630 (1974); *Prentis v. Atlantic Coast Line Co.,* 211 U.S. 210, 225, 29 S.Ct. 67, 69, 53 L.Ed. 150 (1908); *Dreyer v. Illi-*

*nois,* 187 U.S. 71, 84, 23 S.Ct. 28, 32, 47 L.Ed. 79 (1902); *United Beverage Co. of South Bend v. Indiana Alcoholic Beverage Commission,* 760 F.2d 155 (7th Cir. 1985). Cf. *Bates v. State Bar of Arizona,* 433 U.S. 350, 359–62, 97 S.Ct. 2691, 2696–98, 53 L.Ed.2d 810 (1977) (recognizing that state courts may exercise legislative powers); *University of Tennessee v. Elliott,* — U.S. —, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986) (findings of fact made by states' executive agencies have preclusive effect in federal civil rights litigation). The allocation is for the state to decide under domestic law, and it may give the Executive Branch powers that overlap those of the Judicial Branch. See *Felder v. Estelle,* 693 F.2d 549, 554–55 (5th Cir.1982) (Higginbotham, J., concurring); cf. *Barrera v. Young,* 794 F.2d 1264, 1268–70 (7th Cir. 1986).

The Executive Branch of any government has the authority to interpret the law, if only to the extent necessary to decide how to execute that law. The authority of judges to interpret and sometimes decline to enforce a statute is implied from the need to decide cases that are properly before them and from the hierarchy of rules that applies. See *Marbury v. Madison,* 1 Cranch (5 U.S.) 137, 170–80, 2 L.Ed. 60 (1803). The announcement of legal rules is a byproduct of the process of adjudication. The interpretation of the law is a principal function of judges, but it is also an important function of other branches of government. Each branch of the government interprets the law, with equal authority, when necessary for resolution of the problem at hand—adjudication in the case of judges, implementation in the case of executive officials. See Learned Hand, *The Bill of Rights* 3–18, 27–30 (1958). We have held that in interpreting the law executive officials share the attributes of judges and are entitled to absolute immunity. *Carson v. Block,* 790 F.2d 562, 565 (7th Cir.1986); *Henderson v. Lopez,* 790 F.2d 44, 46–47 (7th Cir.1986); *Mother Goose Nursery Schools, Inc. v. Sendak,* 770 F.2d 668 (7th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 884, 88 L.Ed.2d 919 (1986). Ours is not a case of immunity, but the underlying question is the same: When do executive officials have the authority to interpret the law on behalf of their jurisdiction?

That the Attorney General comes before us as an advocate does not diminish his role. The nature of the judicial system forces the Attorney General to advocate as well as to interpret, but a federal court is not authorized on that account to give the Attorney General's views lesser weight than they would receive if they appeared in a bound volume of legal opinions. The statements of law in his brief are the views of the highest responsible official of the Executive Branch of Indiana. Some views expressed in briefs may be poorly considered, but some views expressed in judicial opinions also are poorly considered. Cases get reversed, and briefs may have a more complete exposition of the law than do judicial opinions. Indiana could adopt a principle of domestic law under which briefs are treated solely as advocacy; this is the rule the federal courts use when a lawyer (as opposed to an administrative agency in opinions or regulations) tries to explain the basis of a decision. *SEC v. Chenery Corp.,* 318 U.S. 80, 92–95, 63 S.Ct. 454, 461–63, 87 L.Ed. 626 (1943). But the Supreme Court often gives special consideration to the statutory analysis in the Opinions of the Attorney General or the brief of the Solicitor General representing agencies of the Executive Branch. E.g., *Japan Whaling Ass'n v. American Cetacean Society,* — U.S. —, ———, 106 S.Ct. 2860, 2867–68, 92 L.Ed.2d 166 (1986); *Haig v. Agee,* 453 U.S. 280, 291, 101 S.Ct. 2766, 2774, 69 L.Ed.2d 640 (1981). That the first complete elaboration of the legal position is presented in a brief does not authorize a court to sneeze at the position. Officials often formulate legal positions in the course of litigation, as the bearing of a particular statute becomes evident. A state should be entitled to decide for itself the status of legal interpretations contained in briefs. At all events, the Attorney General's views were not formulated only for use in this litigation. The

Attorney General appears on behalf of the Indiana Parole Board, which adopted in its regulations the legal view that it has unfettered discretion under § 11–13–3–3. This existing view is authoritative under state law, at least for the moment.

In Indiana, as in the federal system and the other states, judicial interpretations of the law by the highest court supersede the executive interpretations. Cf. *United States v. Mendoza,* 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984) (interpretations of law by lower federal courts bind the Executive Branch only with respect to the litigants involved). If the Supreme Court of Indiana had spoken on the meaning of § 11–13–3–3, we would follow its decisions. It has not, however, and until it does the prevailing construction is the one of the Executive Branch of Indiana's government. Any position that disregarded the executive's views would raise profound questions in a federal system, one in which states rather than the national government establish the meaning of state law. See *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (*Pennhurst II*), which concluded that principles of sovereign immunity implicit in the federal structure of our nation prevent a federal court from granting injunctive relief against state officials based on an interpretation of state law that differs from the interpretation placed on that law by the state's Executive Branch (the defendant in *Pennhurst II*). *Pennhurst II* was a strong case for interpretation of state law by a federal court. The Supreme Court of Pennsylvania had construed the state's law differently from the construction defended by the Executive Branch of the state; moreover, a decision based on the state court's construction of state law would have enabled the federal court to avoid a question of federal constitutional law. Still, the Court concluded, the federal court must not grant a remedy against the state based on its own construction of state law. In our case, by contrast, no state court has spoken, and accepting the Executive Branch's construction of state law will enable us to avoid a constitutional question.

Because in Indiana the views of the Supreme Court trump the views of the Attorney General, the Executive Branch does not always speak for the state. This suggests the same sort of caution a federal court exercises when determining whether the Supreme Court of a state would adopt a legal position articulated by a lower court. See *King v. Order of Travelers,* 333 U.S. 153, 68 S.Ct. 488, 92 L.Ed. 608 (1948) (in diversity cases federal courts are not absolutely bound by the construction of an intermediate state court); *Williams, McCarthy, Kinley, Rudy & Picha v. Northwestern National Insurance Group,* 750 F.2d 619, 624–25 (7th Cir.1984). So, too, when a state's construction of its domestic law (by any branch of its government) affects the enforcement of federal rights, there is a second inquiry: whether the state's construction is reasoned, consistent, and sufficient to justify the effect on the federal interest. See *Henry v. Mississippi,* 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965); *Hathorn v. Lovorn,* 457 U.S. 255, 262–63, 102 S.Ct. 2421, 72 L.Ed.2d 824 (1982); *James v. Kentucky,* 466 U.S. 341, 104 S.Ct. 1830, 80 L.Ed.2d 346 (1984). But the interpretation of § 11–13–3–3 does not undercut a federal interest. If the statute means what the Attorney General says it does, there is no federal interest at all.

The Attorney General's understanding of Indiana law is not so far out of line that the Supreme Court of Indiana is certain to go the other way. The court discusses the statute and its implementing regulations. These do not compel a conclusion that the parole board has unfettered discretion, but they permit such a conclusion. Similar indicia would lead a court to accept the interpretation given to a law by a federal agency. E.g., *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984); *Watkins v. Blinzinger,* 789 F.2d 474, 478 (7th Cir.1986). A federal court owes still greater respect for a state agency's construction of state law. So to the extent a federal court is authorized to

venture an independent opinion, I think it likely that the Supreme Court of Indiana will support the Attorney General's view that the new statute and regulations leave the parole board with discretion. Parole in Indiana does not depend on the application of rules to facts; a prisoner's appeal is to discretion rather than to legitimate claims of entitlement; the statute and regulation therefore do not establish a liberty or property interest.

The court is able to resolve today's case without deciding the appropriate treatment of the considered views of the Executive Branch of a state's government. Similarly, I have outlined some views without suggesting a firm answer to the question how federal courts should deal with the Executive Branch's views. I hope, however, that avoidance in this case does not mean inattention in the future. Neither the district court nor the parties discussed the question. *Pennhurst II* has put federal courts out of the business of issuing relief against state officials based on state law, but this case shows that questions of state law are inescapable, because the entitlements established by state law become the basis of claims under the Constitution. I should think it regrettable if a federal court were to order a state to change its practices on the ground that its Executive Branch does not understand state law—even though the formal basis for the order is the due process clause of the fourteenth amendment. Both the parties and the courts should take care in tomorrow's cases to consider the role a state's construction of its own law plays in constitutional litigation.